# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Maxfield Alton Sussman,

Plaintiff,

v.

Deputy Joshua T. Miller, in his individual capacity;

Sergeant Uriah Cain Speight, in his individual capacity; and

Deputy Jeremy Miller, in his individual capacity,

Defendants.

Civil Action No. _____

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**MAY 13 2026**

**JEFFREY P. COLWELL**
**CLERK**

## COMPLAINT AND JURY DEMAND

## TABLE OF CONTENTS

INTRODUCTION ........................................................ 2

JURISDICTION AND VENUE ................................................ 4

PARTIES ................................................................ 4

FACTUAL ALLEGATIONS .................................................. 5

FIRST CLAIM — Fourth Amendment Unreasonable Seizure (§ 1983) ......... 42

SECOND CLAIM — Fourth Amendment Malicious Prosecution (§ 1983) ....... 46

THIRD CLAIM — Failure to Intervene, Fourth Amendment (§ 1983) ........ 48

FOURTH CLAIM — Article II § 7, C.R.S. § 13-21-131 .................... 50

FIFTH CLAIM — Failure to Intervene, Article II § 7, § 13-21-131 ...... 55

SIXTH CLAIM — First Amendment Retaliation (§ 1983) ................... 56

SEVENTH CLAIM — Fourteenth Amendment Fabrication (§ 1983) ............ 67

EIGHTH CLAIM — Fourteenth Amendment Selective Enforcement (§ 1983) ... 72

NINTH CLAIM — Article II §§ 10, 24, 25, C.R.S. § 13-21-131 ........... 75

PRAYER FOR RELIEF ................................................... 78

JURY DEMAND ........................................................ 80

Plaintiff Maxfield Alton Sussman, for his Complaint, alleges as follows:

## INTRODUCTION

1. This is a civil-rights action under 42 U.S.C. § 1983 and C.R.S. § 13-21-131 arising from Plaintiff's warrantless arrest on May 19, 2024, in Fremont County, Colorado, the ensuing prosecution in Fremont County District Court case 24CR184, and Defendants' retaliation against Plaintiff for protected speech, petitioning activity, reporting of alleged official misconduct, evidence preservation, recording activity, and intended resort to the courts.

2. Defendants arrested Plaintiff and caused or permitted criminal process to continue even though the available video, body-worn-camera footage, and reports did not show what the complainants claimed and instead contained materially exculpatory facts that Defendants omitted, ignored, misstated, or failed to correct.

3. This case is pleaded narrowly against the peace-officer defendants who personally participated in, caused, reviewed, approved, or failed to intervene in the unconstitutional seizure, false or incomplete probable-cause narrative, and resulting prosecution in 24CR184.

4. As a result, Plaintiff was seized, jailed, subjected to bond restrictions and a mandatory protection order, deprived of firearm/ammunition-related liberty and property interests, required to appear in court, and forced to defend a criminal case until 24CR184 was dismissed without a conviction in that case.

4A. This action is timely. Plaintiff's § 1983 claims are governed by Colorado's two-year limitations period borrowed from C.R.S. § 13-80-102, and Plaintiff's state-law claims by C.R.S. § 13-21-131(5). Accrual, favorable termination, and the Heck-safe alternative are addressed at ¶¶ 49A and 4B; this Complaint is filed within the applicable limitations period as to each claim.

4B. In the alternative, to the extent any portion of Plaintiff's Fourth Amendment claim is deemed to have accrued earlier than May 20, 2024, Plaintiff alleges that **accrual was deferred** during the pendency of legal process in 24CR184 to the extent required by *Heck v. Humphrey*, 512 U.S. 477 (1994), and *McDonough v. Smith*, 588 U.S. 109 (2019). In the further alternative, the running of the limitations period was equitably tolled in light of Plaintiff's documented disability and the equitable tolling principles applicable to Colorado's borrowed limitations period.

4C. This Complaint pleads facts with the particularity required to survive qualified-immunity review at the pleading stage. See Pearson v. Callahan, 555 U.S. 223, 236 (2009); Iqbal, 556 U.S. at 678–79. Where the Complaint identifies specific factual indicia of Defendants' subjective awareness, motive, or knowledge — including the body-worn-camera audio gap, the prior-notice chronology, and the speech-content references in Defendant Joshua Miller's probable-cause affidavit — Plaintiff does so to satisfy the clearly-established-law prong as it has been applied in retaliatory-arrest, judicial-deception, and fabrication-of-evidence claims by the Tenth Circuit. See, e.g.,

Bledsoe v. Carreno, 53 F.4th 589 (10th Cir. 2022). Plaintiff has reduced the Complaint to the minimum length consistent with that pleading burden. To the extent Defendants attach or invoke body-worn-camera or other extrinsic evidence on a Rule 12(b)(6) motion, that evidence may not be weighed against, or used to attack the veracity of, well-pleaded constitutional allegations. *See Fuqua v. Santa Fe Cnty. Sheriff's Office*, 157 F.4th 1288, 1299–1301 (10th Cir. 2025); *Tal v. Hogan*, 453 F.3d 1244, 1265–66 (10th Cir. 2006).

## JURISDICTION AND VENUE

5. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, and asserts claims under the First, Fourth, and Fourteenth Amendments.

6. This Court has supplemental jurisdiction over Plaintiff's Colorado-law claims under 28 U.S.C. § 1367 because those claims arise from the same May 19, 2024 warrantless arrest, materially false or incomplete reports, legal-process seizure, and prosecution in 24CR184 as Plaintiff's federal claims under 42 U.S.C. § 1983.

7. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b) because all events giving rise to these claims occurred in Fremont County, Colorado.

8. At all relevant times, Defendants acted under color of state law.

## PARTIES

9. Plaintiff Maxfield Alton Sussman is a natural person and resident of Fremont County, Colorado. Plaintiff's mailing and contact information is set forth in the signature block. Concurrent with the filing of this Complaint, Plaintiff has filed a Motion to Restrict Public Access to Plaintiff's

Residential Address pursuant to D.C.COLO.LCivR 7.2, on the basis of personal-safety concerns more fully set forth in that Motion.

10. Defendant Deputy Joshua T. Miller was, at all relevant times, a deputy employed by the Fremont County Sheriff's Office.

11. Defendant Sergeant Uriah Cain Speight was, at all relevant times, a sergeant employed by the Fremont County Sheriff's Office.

12. Defendant Deputy Jeremy Miller was, at all relevant times, a deputy employed by the Fremont County Sheriff's Office.

13. At all relevant times, each Defendant was a "peace officer" as defined by Colorado law, was employed by the Fremont County Sheriff's Office, acted under color of law, and is subject to liability under C.R.S. § 13-21-131.

14. All Defendants are sued in their individual capacities only.

14A. Plaintiff identifies the currently known officer defendants based on the records presently available. If bodycam metadata, CAD records, dispatch records, or discovery identify additional personally involved officers or correct a defendant's legal name, Plaintiff reserves the right to seek leave to amend as permitted by the Federal Rules of Civil Procedure. Plaintiff identifies each Defendant's personal participation in the conduct alleged in this Complaint as required by *Pahls v. Thomas*, 718 F.3d 1210, 1225–28 (10th Cir. 2013), and *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006). The same personal-participation requirement applies to Plaintiff's claims under C.R.S. § 13-21-131. *See Shash v. City of Pueblo*, 770 F. Supp. 3d 1279, 1307–08 (D. Colo. 2025) (holding § 1983's personal-participation requirement applies to § 13-21-131 claims).

## FACTUAL ALLEGATIONS

15. On May 19, 2024, at approximately 1:40 p.m., Defendant Joshua T. Miller was dispatched to 92 Carpenter Trail, Cotopaxi, Colorado, for a report of a person with a weapon.

16. At 92 Carpenter Trail, Miller contacted Elizabeth French and Shaun Boughton.

17. According to Miller's probable-cause statement, French claimed that Plaintiff was standing at his front door holding an "AR style rifle," and French stated she was willing to pursue charges because she had video.

18. According to Miller's probable-cause statement, Boughton showed Miller a cellphone video. Miller did not state that the video clearly showed Plaintiff pointing a firearm. Instead, Miller wrote that he saw Plaintiff standing at his front door "holding a dark object in his hand."

19. Miller also inserted the statement, "I did not see any pistols being pointed at Mr. Sussman in the video," in response to Plaintiff's report that people were driving by his house, harassing him, and pointing pistols at him.

20. Defendant Speight later reported that he overheard dispatch traffic stating that the reporting party accused Plaintiff of brandishing an AR-15 style rifle.

21. Speight also reported that Plaintiff himself called dispatch and advised that the neighbor was driving around in a golf cart "waving a gun." That dispatch/cross-complaint fact gave Defendants pre-arrest notice that Plaintiff was claiming to be the person threatened by an armed pass-by, not merely the aggressor. Plaintiff's contemporaneous "waving a gun" shorthand to dispatch reflected the live, in-motion display of the firearm by Boughton during the OHV pass-by. Plaintiff's offered video, as further described in ¶¶ 27 and 39B, depicts Boughton pointing the firearm directly at Plaintiff during the second pass; Plaintiff's "waving" shorthand to dispatch and his subsequent on-scene description of "pointing" describe the same conduct from the same incident.

22. Speight reported that he and Deputy Jeremy Miller arrived at 92 Carpenter Trail after Miller obtained statements from the reporting parties, and that they then followed Miller to Plaintiff's residence. Defendants Joshua T. Miller, Speight, and Jeremy Miller engaged in a sustained discussion at 92 Carpenter Trail following the conclusion of the complainant interview, the substance of which was not captured on Joshua T. Miller's body-worn-camera audio because of the deliberate audio mute described at ¶ 25D. Jeremy Miller was a participant in that discussion and was visible on the body-worn-camera video continuing to confer with Joshua T. Miller and Speight from approximately the time of the mute initiation until the three Defendants returned to their vehicles and departed for Plaintiff's residence.

23. Speight reported that Plaintiff was using a recording device and that Miller told Plaintiff this was fine and Plaintiff could continue recording.

24. Speight further reported that Miller patted Plaintiff down for weapons and that Plaintiff was not found to have any weapons on him.

24A. During the daytime hours of May 19, 2024 preceding the encounter described herein, Plaintiff was on his own property and intermittently engaged in lawful recreational target-shooting with a BB gun. Plaintiff's BB-gun activity was independent of the complainants' OHV pass-by sequence described in ¶ 39B. It is possible Plaintiff was outside engaged in lawful recreational target-shooting at the time of the complainants' first pass. The second pass — during which Boughton drew and pointed a handgun at Plaintiff while French, seated as passenger, actively recorded on her cellphone and narrated into her own recording — is described in ¶ 39B.

24B. The "dark object" depicted in the complainants' cellphone video, ¶ 18, is consistent with the cellphone Plaintiff was holding as Plaintiff recorded the complainants during the OHV pass-by. To the extent Plaintiff was holding the BB gun during any portion of

any pass-by, the BB gun was held out to Plaintiff's side and generally downward, pointed away from the public roadway and away from the complainants. Plaintiff did not aim, sight, or "draw down" the BB gun in the direction of the complainants or the roadway, and did not discharge the BB gun during the pass-by.

24C. During the May 19, 2024 police encounter, Plaintiff attempted to explain to Defendants what had occurred during the complainants' OHV pass-by. Plaintiff has documented disabilities, including Generalized Anxiety Disorder, Conversion Disorder / Functional Neurological Symptom Disorder with attacks or seizures, and PTSD, which can affect Plaintiff's ability to articulate events accurately and consistently under stress, particularly during a hostile or adversarial interaction in which Plaintiff was surrounded on his own property by armed officers in close physical proximity, was no longer free to leave or terminate the encounter, had been patted down and confirmed weaponless, and was at a distance Plaintiff reasonably perceived as physically intimidating. To the extent the body-worn-camera footage reflects Plaintiff making any up-and-out gesture or stating words to the effect that Plaintiff is "allowed to defend [himself]," those gestures and statements were made during the police encounter — not during the OHV pass-by — and were Plaintiff's stress-impaired attempt to assert his right under Colorado law to defend himself, his family, and his property at his own residence, while struggling to accurately describe events that had occurred earlier. See C.R.S. § 18-1-704 (use of physical force in defense of a person); Colo. Const. art. II, § 13 (right to bear arms in defense of home, person, and property). Any post-encounter gesture or statement by Plaintiff is not an admission of the actus reus of felony menacing under C.R.S. § 18-3-206 and was not contemporaneous with any conduct alleged to have occurred during the OHV pass-by. See ¶ 39C (complainants' own video confirms

Plaintiff was inside his residence recording through a cracked door, not outside, during the pass-by). See Joshua Miller BWC Video "I held out my BB gun, and she started screaming, 'he's pointing an AK at me'. I don't own an AK sir. I don't own any actual firearms." Plaintiff additionally articulated the legal basis for any defensive weapon display: "I'm allowed to hold up any actual weapon on my own property to defend my property … I'm defending my life." Joshua T. Miller responded by parsing defense-of-property versus defense-of-life rather than addressing whether the conduct alleged supplied any element of felony menacing.

25. Speight reported that his own recording failed because he had not logged into the Visual Labs application, and that Joshua Miller's body-worn camera captured the interaction with Plaintiff.

25A. Colorado law required Defendants to wear and activate body-worn cameras during this law-enforcement response and public interaction. C.R.S. § 24-31-902(1)(a)(II)(A). Speight's failure was not an unknown and uncorrectable equipment malfunction within the statutory safe harbor; rather, Speight failed to ensure his body-worn camera system was properly logged in and recording during a required law-enforcement encounter.

25B. Plaintiff invokes federal common-law spoliation principles as the primary basis for an adverse inference that Speight's missing body-worn-camera footage would have reflected the conduct alleged in this Complaint, and the permissive inference under C.R.S. § 24-31-902(1)(a)(III) as a supplemental basis; the factual predicates for that inference are pleaded at ¶¶ 25, 25A, 25C, 25D, 51A, 51B, and 51D.

25C. Specifically as to Defendant Speight:

(i) Speight was on scene at Plaintiff's residence at the time of the seizure decision;

(ii) Speight was within audible range of Plaintiff's pre-arrest report that the reporting parties had pointed firearms at Plaintiff and Plaintiff's offer to display video proof;

(iii) Speight observed or had reason to observe Deputy Joshua T. Miller's refusal to view that video;

(iv) Speight was the senior FCSO sergeant present and had practical authority to direct Joshua T. Miller to review the offered video before effecting the arrest;

(v) Speight personally authored the supplemental report containing the "no proof" assertion described in ¶ 37, despite Plaintiff's contrary offer being within Speight's hearing or captured on Joshua T. Miller's BWC; Speight authored or ratified that false narrative notwithstanding that Joshua T. Miller had affirmatively represented to Plaintiff on-camera, falsely, that Speight's body-worn camera was recording, see ¶ 25D.

(vi) Speight took no corrective action thereafter to alert prosecutors, the court, or FCSO command to the false "no proof" narrative;

(vii) During the muted-audio deliberation window described at ¶ 25D, Speight, Joshua T. Miller, and Jeremy Miller engaged in a three-officer discussion at 92 Carpenter Trail visible on Joshua T. Miller's body-worn-camera video.

(viii) Speight emerged from the complainants' residence carrying a stack of paper and rejoined Joshua T. Miller and Jeremy Miller in the driveway, where the three Defendants continued the muted-audio discussion until they separated to return to their vehicles.

25D. Joshua T. Miller's body-worn-camera footage from the May 19, 2024 encounter contains a substantial audio gap that began after the officers concluded their interview with French and Boughton at 92 Carpenter Trail and ended after Joshua T. Miller had

Page 10 of 80

begun driving from the complainants' location toward Plaintiff's residence but before any contact with Plaintiff. During this gap, the BWC continued to record video but did not record audio. Plaintiff alleges, on information and belief, that the gap reflects deliberate muting rather than equipment failure:

(i) video continuity through the gap demonstrates the BWC remained operational; the BWC system's own automated logging audio at the moment of un-mute audibly states "un-muting mic," which is the BWC system's logged confirmation that the preceding audio gap was a deliberate user-initiated mute rather than equipment malfunction;

(ii) the gap encompasses the officers' post-interview, pre-contact deliberation about how to proceed, and audio resumed only after that deliberation concluded — not upon arrival at or contact with Plaintiff — which is inconsistent with routine activation patterns tied to subject contact and consistent with intentional muting that tracked the content of the deliberation; and

(iii) the gap encompasses the precise window during which the officers, having received the complainants' narrative and Plaintiff's cross-complaint through dispatch, deliberated about whether to review Plaintiff's offered evidence, what to include in the probable-cause statement, and how to proceed. The audio gap was approximately eight and one-half minutes in duration and encompassed the entirety of the post-interview, pre-Plaintiff-contact deliberation period among Defendants at 92 Carpenter Trail and during the initial portion of Joshua T. Miller's drive toward Plaintiff's residence. Plaintiff invokes federal common-law spoliation principles and, in the alternative, the permissive inference under C.R.S. § 24-31-902(1)(a)(III), to support an inference that the muted audio would have reflected officer-to-officer deliberation evidencing: (a) subjective awareness that probable cause was contested or insufficient; (b) subjective

awareness of Plaintiff's protected reporting and cross-complaint; (c) deliberate omission of material exculpatory facts from the probable-cause statement; and (d) coordination concerning the "no proof" narrative subsequently reflected in Speight's supplemental report.

(iv) Joshua T. Miller stated to Jeremy Miller (recorded in his own body-worn-camera audio), during the conversation pause created by Defendant Speight's request to use the complainants' restroom, words to the effect of 'I'm going to go on mute real quick,' directly evidencing Joshua T. Miller's awareness of, and active control over, the BWC audio mute function during the encounter.

(v) Plaintiff additionally challenged Joshua T. Miller on body-worn-camera audio during the encounter at Plaintiff's residence, stating words to the effect of "and you're hiding your body cam. Are both your body cams on at the present time?" Joshua T. Miller responded affirmatively with words to the effect of "Yes they are," representing on-camera that both his and Speight's body-worn cameras were recording at the time. Subsequent FCSO records and Speight's own supplemental report confirm that Speight produced no body-worn-camera footage of the May 19, 2024 encounter because Speight had not logged into the FCSO Visual Labs system, see ¶¶ 25, 25A. Joshua T. Miller's on-camera affirmation that both body-worn cameras were recording was therefore materially false at the time it was made. Plaintiff alleges, on information and belief, that Joshua T. Miller either knew, or recklessly disregarded the fact, at the time of his on-camera affirmation, that Speight's body-worn camera was not recording, given that he had been on-scene with Speight during the muted-audio strategy-discussion window described at ¶¶ 25C(vii)–(viii).

25E. Joshua T. Miller reviewed the complainants' cellphone video at 92 Carpenter Trail; Plaintiff requested to view it and was refused (¶ 29). The video's limitations, French's inconsistent narration, the twofold disclaimer, and Plaintiff's contemporaneous Boughton-pistol-pointing video are pleaded at ¶¶ 28–29, 39B–39D. Had Defendants reviewed the available evidence — the complainants' video, the 911 audio, Plaintiff's cross-complaint, or Plaintiff's offered contemporaneous video — the probable-cause record would have disclosed the complainants' own armed conduct toward Plaintiff, their motive to fabricate or exaggerate, and that Plaintiff's contemporaneous activity (¶¶ 24A–24B) supplied no element of felony menacing under C.R.S. § 18-3-206.

25F. During the May 19, 2024 encounter, Defendants Joshua Miller, Jeremy Miller, and Speight became aware, contemporaneously and from Plaintiff's own statements at the scene, that complainant Boughton had previously, in close temporal proximity, drawn and pointed handguns at Plaintiff on multiple occasions on May 19, 2024, *see* ¶¶ 39A, 39B. Plaintiff offered video evidence of that conduct for Defendants' immediate review. Boughton's alleged conduct, if substantiated, would itself constitute felony menacing under Colorado law mirroring the offense for which Plaintiff was being investigated. Defendants did not (a) interview Boughton regarding Plaintiff's allegation, (b) request, secure, or review video evidence of Boughton's alleged conduct, (c) detain or arrest Boughton, (d) refer Boughton for charging, or (e) document Plaintiff's allegation in any contemporaneous report as a counter-complaint warranting investigation. Plaintiff and Boughton were both alleged participants in the same May 19 weapon-related incident sequence; both were subjects of contemporaneous accusations of menacing-type conduct; both had video evidence available; and both were known to Defendants at the scene as such. Notwithstanding this material parity, only Plaintiff was arrested, only

Plaintiff was prosecuted, and only Plaintiff was the subject of a probable cause statement. Plaintiff alleges that this differential treatment constitutes objective comparator evidence sufficient to satisfy the *Nieves* exception. *See Nieves v. Bartlett*, 587 U.S. 391, 406–07 (2019); *Gonzalez v. Trevino*, 602 U.S. 653, 657–58 (2024) (per curiam) (clarifying that the only express limit on the kind of evidence a plaintiff may present to satisfy the *Nieves* exception is that it must be objective, and that the exception is not limited to virtually identical comparators). The differential treatment of two contemporaneously alleged armed actors during a single investigation — where one had engaged in protected activity and the other had not — is the kind of objective same-incident comparator evidence the *Nieves* exception contemplates.

26. Before any arrest was made, Plaintiff told Defendants Joshua T. Miller and Sergeant Uriah Cain Speight, on-scene at Plaintiff's residence, that the reporting parties had been driving by his residence, harassing him, and pointing guns or pistols at him. The substance of Plaintiff's same-incident cross-complaint had previously been transmitted to Defendants through dispatch, see ¶¶ 21, 22, and was therefore available to Defendant Jeremy Miller during the muted-audio strategy-discussion window at 92 Carpenter Trail described at ¶¶ 22, 25C(vii)–(viii), 25D, before any of the three Defendants departed for Plaintiff's residence.

27. Before any arrest was made, Plaintiff further made known to Defendants Joshua T. Miller and Speight, on-scene at Plaintiff's residence, that he possessed video evidence of the events giving rise to his cross-complaint against the reporting parties, including video showing one of the reporting parties pointing a gun at Plaintiff during a pass-by of Plaintiff's residence.

28. Before any arrest was made, Plaintiff possessed on his recording device contemporaneous video of the OHV second-pass sequence described in ¶ 39B, including video depicting Boughton holding and pointing a handgun at Plaintiff. Plaintiff attempted, on-camera and during the

encounter, to identify and offer that contemporaneous video evidence to Defendants. Plaintiff additionally requested on-scene to view the complainants' cellphone video that Joshua T. Miller had identified as the basis for the complainants' allegations.

29. Joshua T. Miller refused Plaintiff's request to view the complainants' video. Defendants did not provide Plaintiff any opportunity to display, retrieve, or present any of the contemporaneous video evidence Plaintiff possessed and was attempting to identify. Joshua T. Miller's refusal was made while Joshua T. Miller and Defendant Speight stood in close physical proximity to Plaintiff, in a posture and at a distance Plaintiff reasonably perceived as physically intimidating, after Plaintiff had been patted down and confirmed weaponless by Defendants on Plaintiff's own residential property. Plaintiff's documented disabilities — Generalized Anxiety Disorder, Conversion Disorder / Functional Neurological Symptom Disorder with attacks or seizures, and PTSD, see ¶ 24C — were known or constructively known to Joshua T. Miller from prior individualized contacts with Plaintiff, see ¶¶ 51C–51D. The combination of Defendants' close-quarters posture, the pre-determined outcome of the encounter, see ¶ 32 and ¶ 106, and Plaintiff's stress-impaired articulation arising from Plaintiff's documented disabilities and from reasonable fear arising from Plaintiff's documented prior history of being targeted by FCSO personnel as a result of FCSO-associated complainants, see ¶¶ 51A–51I, materially impeded Plaintiff's ability to articulate or display the contemporaneous video evidence in his possession.

30. Joshua Miller and Speight did not require review of Plaintiff's offered video before Plaintiff was handcuffed and placed in custody, despite hearing Plaintiff's report, knowing Plaintiff had already reported a neighbor "waving a gun" through dispatch, and knowing Plaintiff had no weapon on his person after the pat-down.

31. Plaintiff's offered video was readily available exculpatory evidence. It was in Plaintiff's possession, being voluntarily offered to officers at the scene, and could have been reviewed before the arrest with minimal delay.

32. Following the exchange described at ¶¶ 28–29, Joshua T. Miller declared the conversation effectively over with words to the effect of "OK, Max, I don't think we're going to get anywhere with this," ordered Plaintiff to turn around and place his hands behind his back, and arrested Plaintiff for felony menacing. The decision to arrest was announced not in response to any inculpatory statement by Plaintiff, but in response to Plaintiff's continued assertion of constitutionally protected rights, including Plaintiff's express on-scene invocation of the First Amendment, see ¶ 104B, and despite Plaintiff's contemporaneous attempts under conditions of impaired articulation to identify and offer dispositive video evidence in Plaintiff's possession at that time, see ¶¶ 28–29. That pre-determined arrest posture is independently captured earlier on Joshua T. Miller's own body-worn-camera audio at 92 Carpenter Trail, where, before any contact with Plaintiff, Joshua T. Miller told the complainants that he was "doubting [Plaintiff is] going to answer the door for us ... which might entail writing a warrant for him" — confirming that the arrest-pathway mindset was set during the complainant interview rather than formed in response to any on-scene conduct by Plaintiff.

33. To the extent Joshua T. Miller's probable-cause statement claims Plaintiff admitted exiting his house with a gun and "held it in the air," and to the extent Speight's supplement describes Plaintiff as motioning as if he were holding a gun up into the air with his right arm, those characterizations rest on Plaintiff's stress-impaired on-camera demonstration during the police encounter, not on contemporaneous conduct during the OHV pass-by. The body-worn-camera footage reflects Plaintiff using his arms during the encounter to attempt to demonstrate to Defendants generally speaking what had occurred earlier without appearing threatening to the

officers or appearing to "reach" in a way that might result in Defendants drawing weapons or otherwise escalating the encounter to use of force against Plaintiff. Plaintiff's deliberate restraint in his demonstration gestures, despite Plaintiff's documented disability symptoms and the close-quarters intimidating posture of the encounter, see ¶¶ 24C, 29, is itself probative of Plaintiff's awareness during the encounter that any sudden or sweeping movement would be perceived by Defendants as a threat. That demonstration gesture was neither an admission of, nor the actus reus of, felony menacing under C.R.S. § 18-3-206, and it was not contemporaneous with any conduct during the OHV pass-by. See ¶¶ 24A–24C. Critically, complainant Elizabeth French herself, in two separate recordings (her 911 call and her interview with Joshua T. Miller), expressly disclaimed knowledge of whether Plaintiff was pointing the firearm at her, stating in her 911 call that "I don't know if he was pointing it at me" and in her BWC interview "I don't know if he pointed it at me." These twofold admissions, captured on recordings to which Defendants had access before any probable-cause materials were submitted, are dispositive of the imminent-fear element of felony menacing and were omitted from the probable-cause statement and supplemental reports.

34. Instead of reviewing Plaintiff's offered video and documenting the exculpatory facts, Joshua Miller told Plaintiff that he had committed felony menacing 'even with a B.B. gun' because the reporting parties 'believed it was [a] real [gun].'"

35. Joshua Miller then ordered Plaintiff to turn around, handcuffed him, placed him in the back of his patrol vehicle, and transported him to jail.

36. At the time of the arrest, no warrant existed.

37. Speight later authored, approved, or ratified a supplemental report stating that Plaintiff was asked whether he had proof and "did not." See Joshua Miller BWC Video, reflects the actual on-scene exchange: Joshua T. Miller asked "Do you have proof of that?"; Plaintiff redirected

with "Do they have proof of what they're saying, sir?"; Joshua T. Miller acknowledged "Yeah, they have a video"; Plaintiff requested "Let me see the video"; Joshua T. Miller refused with "I'm not going to show you the video. It's on their phone right now. They're going to email it to me as evidence"; and Plaintiff stated "I've already emailed my evidence as well," referring to Plaintiff's contemporaneous video of the OHV second pass that Plaintiff was attempting to identify. Joshua T. Miller responded with words to the effect of "Oh, did you email us again?" Speight's supplemental "no proof" narrative omitted Plaintiff's contemporaneous video, Plaintiff's request to view the complainants' video, Joshua T. Miller's refusal of that request, and Joshua T. Miller's on-camera acknowledgment of Plaintiff's prior reporting communications.

38. Miller's probable-cause statement likewise omitted Plaintiff's contemporaneous offer to show exculpatory video and instead framed the incident as if Plaintiff had committed felony menacing based on a video that showed only a "dark object," despite Miller's statement that he did not see pistols being pointed at Plaintiff in that video and despite Plaintiff's pre-arrest offer to show contrary video evidence.

39. The available video evidence, bodycam evidence, and reports materially undermined the accusation against Plaintiff. Specifically, the evidence showed or will show facts including the following:

39A. Earlier the same afternoon, between Pass 1 and Pass 2 of the OHV sequence described at ¶ 39B, in an attempt to identify the complainants, to document their conduct, and to request they stop their conduct, Plaintiff briefly followed the complainants in his own vehicle along a nearby road, drove slowly, and approached only after the complainants had stopped their vehicle in a third party's driveway. Plaintiff did not exit his vehicle and did not display any firearm, BB gun, or other object. Plaintiff verbally asked the

complainants to "stop driving by his residence and pointing a firearm at him". In response, Boughton drew and pointed a handgun at Plaintiff through Plaintiff's vehicle window — conduct that, if substantiated, would itself constitute felony menacing under C.R.S. § 18-3-206, the same offense for which Plaintiff was later charged. Plaintiff disengaged, returned to his home, and contemporaneously reported the firearm display to dispatch. See Dispatch Radio Audio; CAD Call For Service Detail Report at 13:43:24 (recording Plaintiff's report that "the people pointed an actual pistol at him when he was in his car"). The Pass 2 OHV firearm-pointing described at ¶ 39B occurred subsequently, after Plaintiff had returned to his home. Plaintiff's conduct during the vehicle encounter described in this paragraph did not satisfy any element of felony menacing under C.R.S. § 18-3-206 (which requires use or threatened use of a deadly weapon) or any analogous offense. To the extent the complainants subsequently reported to Defendants that Plaintiff allegedly 'tried [to run them over with his car]' or threatened them (see CAD Call For Service Detail Report at 13:41:52; See Joshua Miller BWC Video, those mischaracterizations are inconsistent with Plaintiff's actual conduct and form part of the materially false narrative the Seventh Claim addresses.

39B. Plaintiff's contemporaneous video and account reflect a two-pass OHV sequence on May 19, 2024, with the vehicle encounter described at ¶ 39A occurring between the two passes. In the first pass, Boughton drove the OHV slowly past Plaintiff's residence in one direction while revving the engine, with French as passenger; no firearm-pointing allegation arises from the first pass. The OHV then turned and made a second pass in the opposite direction. During the second pass:

(i) Boughton drove with his right hand while pointing a pistol at Plaintiff with his left hand, and

(ii) French, seated as passenger, was actively recording video on her cellphone, narrating that Plaintiff was 'pointing an AR at us' and 'brandishing an AR at me.' See Complainants' Cellphone Video. Following the pass-by, French returned to her residence at 92 Carpenter Trail, called 911, and was later interviewed in person by Defendant Joshua T. Miller. Both her 911 call and her interview with Miller contain an express two-fold admission, in French's own words, that she did not know whether Plaintiff was pointing the firearm at her. 911 call: 'I don't know if he was pointing it at me, but it was very clear he was brandishing it in the air.' See 911 Call Audio. Interview with Miller: 'I don't know if he pointed it at me, but it's very apparent that it's a fucking AR.' See Joshua Miller BWC Video. Both admissions directly contradicted French's contemporaneous cellphone-video assertions.

39C. The complainants' cellphone video on which Defendants relied did not clearly show Plaintiff with a gun and did not clearly show Plaintiff at all in the manner later described in reports. Body-worn-camera video, See Joshua Miller BWC Video, reflects Joshua T. Miller's review of the complainants' cellphone video at 92 Carpenter Trail; See Complainants' Cellphone Video. During the portion of the complainants' cellphone video in which French narrates 'now he's pointing an AR at us,' Plaintiff is visible inside his residence through a partially open door. The image quality of the complainants' video at that point is sufficiently limited that Joshua T. Miller's own Statement of Probable Cause described the depicted object only as a 'dark object in his hand,' see ¶ 18. The specific activity Plaintiff was engaged in (recording the pass-by on his own cellphone) is not separately discernible from the complainants' video alone but is confirmed by Plaintiff's contemporaneous video captured from inside the residence during the same pass-by. The complainants' video on its face does not depict Plaintiff outside, does not depict Plaintiff's

hands or what he may have been holding in any usable detail, and does not depict any conduct corroborating French's narrated mischaracterization of Plaintiff 'pointing an AR.' French's contemporaneous narration into her own video recording was therefore inconsistent with what her own video actually depicted.

39D. The same relied-upon video did not show Shaun Boughton's left hand or what he was holding, because the cellphone video was shot by French from the OHV passenger seat with the camera directed away from Boughton, toward the road, and toward Plaintiff's residence; See Complainants' Cellphone Video.

39E. Defendant Speight, while not recording on his own body-worn camera, see ¶¶ 25, 25A, entered the complainants' residence at the invitation of Shaun Boughton during the muted-audio strategy-discussion window described at ¶¶ 25C(vii)–(viii), 25D. See Joshua Miller BWC Video (Speight's request to use the complainants' restroom and Boughton's invitation); See Joshua Miller BWC Video (visual record of Speight emerging from the complainants' residence carrying a stack of paper and rejoining Joshua T. Miller and Jeremy Miller in the driveway).

39F. During Joshua T. Miller's BWC interview of the complainants at 92 Carpenter Trail — after both OHV passes had occurred and after French's 911 call — Boughton stated words to the effect that he could drive his OHV back and forth in front of Plaintiff's home to bait Plaintiff outside if officers wanted. See Joshua Miller BWC Video. Boughton stated, in substance: 'Well, if you want, I can jump on the side by side. He'll come out ... The second he hears that thing start ... he's out the door ... I'll just drive back up on the property up there. He'll come out the door. I guarantee it.' Joshua T. Miller responded, on BWC, 'we're not going to provoke or antagonize ... because us showing up is already provocation and antagonistic,' recognizing the bait-Plaintiff character of Boughton's proposal. Boughton's

stated willingness to bait Plaintiff with the OHV aligns with the two-pass conduct described in ¶ 39B, in which the OHV in fact made a slow first pass with engine revving followed by a second pass in the opposite direction during which Boughton pointed a pistol at Plaintiff and French recorded while narrating into her own recording. Boughton's post-hoc statement to law enforcement constitutes an admission that the OHV-pass pattern was deliberately calibrated to provoke a reaction from Plaintiff.

39G. During Joshua T. Miller's BWC interview of the complainants at 92 Carpenter Trail, before any contact with Plaintiff, Miller stated, in substance, that Plaintiff held paranoid beliefs and that the current allegations 'fit' a pattern from a prior incident: 'I believe he thinks people are taunting and stalking … because he's had an issue with another neighbor before … but this being like a legitimate, it kind of fits where something had happened before, it fits the same mode of operations for him.' See Joshua Miller BWC Video. Miller's pre-contact statements characterized Plaintiff's prior stalking-report complaints (¶ 51A) and protected-reporting activity (¶ 51 series) as a 'belief' framework rather than as facts warranting investigation, and used a prior uncharged incident Miller could not actually connect to Plaintiff to bootstrap pattern-credibility for the current complainants' allegations.

39H. The body-worn-camera footage supports Plaintiff's same-incident comparator allegations because it shows that officers were presented with competing weapon-related allegations during the same call for service: the complainants accused Plaintiff, Plaintiff accused Boughton and/or the reporting parties, Plaintiff offered video proof before arrest, officers refused to review Plaintiff's video, and officers arrested Plaintiff while taking no comparable enforcement action against Boughton. Body-worn-camera audio, See Joshua Miller BWC Video (officers presented with French and Boughton's narrative and review

of complainants' cellphone video at 92 Carpenter Trail, see ¶¶ 39C–39D); See Joshua Miller BWC Video (officers presented with Plaintiff's cross-complaint, Plaintiff's request to view complainants' video, Plaintiff's contemporaneous video evidence on his phone in his possession, Joshua T. Miller's refusal of Plaintiff's video-view request, and arrest of Plaintiff while taking no comparable enforcement action against Boughton).

39I. The complainants' cellphone-video recording during the OHV pass-by and French's 911 call were two separate recordings made at different times; French called 911 from her residence after the pass-by had concluded and described the pass-by in past tense. French's express two-fold admission to dispatch and to Joshua T. Miller (¶ 39B(ii)) — that she did not know whether Plaintiff was pointing the firearm at her — directly negates the imminent-fear element of felony menacing under C.R.S. § 18-3-206. Defendants Joshua T. Miller and Speight had access to the 911 audio, the complainants' cellphone video, and dispatch records before any probable-cause materials were submitted; each of the facts identified herein was either known to or recklessly disregarded by Defendants and was omitted from the probable-cause materials and supplemental reports.

40. The facts in Paragraph 39 were material because they tended to show that the reporting parties were not reliably describing a felony menacing offense by Plaintiff, that Plaintiff had contemporaneous evidence supporting his report of being threatened, and that Defendants credited the reporting parties' false or incomplete narrative, refused to consider Plaintiff's contrary proof, and failed to correct the resulting probable-cause record.

41. Joshua T. Miller's probable-cause statement affirmatively included inflammatory and prejudicial matter not necessary to establish any element of the alleged offense. That matter included references to prior unrelated calls involving a black Chrysler and characterizations of Plaintiff's beliefs about the Fremont County Sheriff's Office. These inclusions did not bear on whether

Plaintiff committed felony menacing on May 19, 2024 — the only offense for which Plaintiff was being detained — and operated solely to prejudice the magistrate's probable-cause assessment by suggesting general dangerousness, instability, or hostility toward law enforcement.

41A. The same probable-cause statement omitted material exculpatory facts known to Joshua T. Miller and the other Defendants at the time of arrest, including:

(i) Plaintiff's contemporaneous, on-camera attempt to identify and offer video evidence in Plaintiff's possession depicting Boughton drawing and pointing a handgun at Plaintiff during the OHV second pass, and Plaintiff's contemporaneous request to view the complainants' video, see ¶¶ 28–29;

(ii) Joshua T. Miller's on-scene refusal of Plaintiff's request to view the complainants' video and the absence of any opportunity provided to Plaintiff by Joshua T. Miller or Speight to display the contemporaneous video evidence in Plaintiff's possession;

(iii) the no-weapon pat-down, which eliminated any post-pat-down officer-safety justification for refusing to view the offered video;

(iv) the dispatch / cross-complaint information reflecting Plaintiff's contemporaneous reports of armed conduct by the reporting parties (¶¶ 21, 22, 39A); and

(v) Joshua T. Miller's own qualified description of the complainants' video as showing only a 'dark object,' and the fact that the complainants' video neither corroborated nor rebutted Plaintiff's contemporaneous cross-complaint of being threatened with a pistol or other firearm by the complainants.

(vi) Plaintiff's lawful, recreational target-shooting activity on his own property and Plaintiff's contemporaneous recording of the complainants' pass-by, as alleged at ¶¶ 24A–24B,

both of which Defendants would have learned through ordinary investigative inquiry and neither of which supports any element of felony menacing under C.R.S. § 18-3-206.

(vii)  French's twofold express admission, in her 911 call and in her interview with Joshua T. Miller, that she did not know whether Plaintiff was pointing the firearm at her, see ¶ 39B(ii).

(viii) The conditions described at ¶ 29 under which Plaintiff was attempting to communicate with Defendants, and the materially false 'no proof' narrative subsequently propagated notwithstanding those conditions.

41B. The probable-cause statement was infirm in both directions: it included inflammatory matter not necessary to any element of felony menacing (¶ 41) and omitted material exculpatory facts (¶ 41A). The corrected affidavit — with the false or misleading inclusions stricken and the omitted facts added, see Stewart v. Donges, 915 F.2d 572, 581–83 & n.13 (10th Cir. 1990); Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996) — would not have established probable cause for felony menacing or any alternative arrest offense known to Defendants at the scene. See ¶¶ 42C, 60, 60A, 70, 89.

41C. Defendant Joshua T. Miller's pre-encounter conduct with the complainants reflected demonstrable predetermined bias toward Plaintiff. On Joshua T. Miller's body-worn-camera audio at 92 Carpenter Trail, before any contact with Plaintiff and before any review of Plaintiff's cross-complaint, Joshua T. Miller told the complainants that "I believe he thinks people are taunting and stalking" and that "it fits the same mode of operations for him," referring to an unverified, no-prosecution prior allegation by an unidentified out-of-state party. Joshua T. Miller characterized the complainants' uninvestigated narrative as "legitimate" before speaking to Plaintiff. Joshua T. Miller

additionally disclosed to the complainants his own prior personal contacts with Plaintiff including civil-paperwork service. These pre-encounter statements were captured on Joshua T. Miller's own body-worn camera and were available to Defendants Speight and Jeremy Miller through ordinary review channels. The pre-encounter prejudgment Joshua T. Miller voiced to the complainants directly tracks the dismissive characterization of Plaintiff later deployed in the probable-cause affidavit and is itself an indicium that the affidavit's inflammatory content (¶ 41) was the product of pre-existing animus rather than inadvertent inclusion.

42. The failure to permit Plaintiff to display the contemporaneous video evidence in his possession before arrest, the reliance on the complainants' video for inculpatory inferences while ignoring its limitations, and the subsequent false or misleading reporting about what the available video evidence showed and what Plaintiff offered, caused Plaintiff's arrest, continued seizure, and prosecution.

42A. Plaintiff does not allege liability based on a mere negligent failure to investigate every possible lead. Plaintiff alleges that Defendants had actual pre-arrest notice of material exculpatory evidence, were actively offered that evidence at the scene, refused to review it, omitted the offer from reports and probable-cause materials, and then created or maintained a false or misleading "no proof" narrative. The omitted facts were material because they directly undermined the reporting parties' credibility, supported Plaintiff's same-incident cross-complaint, and defeated probable cause when added to the corrected probable-cause record. Although officers ordinarily need not credit a suspect's exculpatory explanation, *see Romero v. Fay*, 45 F.3d 1472, 1478 (10th Cir. 1995), the rule does not insulate officers who refuse to review readily available

exculpatory evidence in the suspect's immediate possession and offered for review at the scene.

42B. Plaintiff alleges these facts to establish personal participation by each Defendant in the conduct alleged, as required by Pahls v. Thomas, 718 F.3d 1210, 1225–28 (10th Cir. 2013), and Trujillo v. Williams, 465 F.3d 1210, 1227 (10th Cir. 2006). Plaintiff does not plead a free-standing § 1983 conspiracy claim. Each Defendant's individual acts and omissions — Joshua T. Miller's preparation and submission of the materially false probable-cause statement, on-scene refusal of Plaintiff's request to view the complainants' video, and on-scene refusal to permit Plaintiff to display his contemporaneous video evidence; Speight's authoring or ratification of the false "no proof" narrative, on-scene presence during the warrantless arrest, and failure to intervene in or correct the unconstitutional seizure; and Jeremy Miller's failure to intervene during the muted-audio strategy-discussion window at 92 Carpenter Trail described at ¶¶ 22, 25C(vii)–(viii), 25D — independently caused or contributed to the constitutional deprivations alleged in this Complaint. Each Defendant is liable for his own conduct, not for the conduct of others.

42C. The corrected-affidavit framework set out in ¶¶ 41, 41A, and 41B applies equally to each Defendant's conduct alleged in this Complaint. The same materially false inclusions and material omissions identified there are the basis for Plaintiff's Fourth Amendment, Fourteenth Amendment, and C.R.S. § 13-21-131 claims, and the same corrected-affidavit calculation is the test for whether probable cause would have existed.

43. Speight was present for or had direct knowledge of the arrest, heard or had reason to know Plaintiff was offering exculpatory video proof, knew or had reason to know his own camera

Page 27 of 80

failed to record, knew or had reason to know Joshua Miller's bodycam captured the interaction, and had a realistic opportunity to stop the arrest, slow the arrest, require review of the video, require a fuller investigation, or insist that material exculpatory facts be documented before Plaintiff was seized and before false or incomplete reports were finalized.

44. Deputy Jeremy Miller's personal participation in the conduct alleged is anchored to the muted-audio strategy-discussion window at 92 Carpenter Trail described at ¶¶ 22, 25C(vii)–(viii), and 25D. Jeremy Miller is not visible on body-worn-camera video as a participant in the on-scene interrogation of Plaintiff at Plaintiff's residence; Jeremy Miller arrived at Plaintiff's residence at or around the time Plaintiff had been placed in the patrol vehicle for transport. During the muted-audio strategy-discussion window, Jeremy Miller had a realistic opportunity — based on the dispatch information reflecting Plaintiff's same-incident cross-complaint, the limitations of the complainants' "dark object" cellphone video, and the substance of the three-officer deliberation among Defendants — to require review of available evidence, require a fuller investigation, dissent from the arrest decision, or insist that material exculpatory facts be documented before the arrest proceeded. Jeremy Miller's failure to do so is pleaded as the primary basis for his liability under the Third and Fifth Claims (failure to intervene). See ¶¶ 80, 97. Specifically, dispatch records reflect that Plaintiff's "waving a gun" cross-complaint was transmitted over the dispatch channel that Jeremy Miller monitored prior to his arrival at 92 Carpenter Trail, and the contents of the complainants' interview — including the limitations of the "dark object" cellphone video and Boughton's bait-Plaintiff statements (¶ 39F) — were audible on Joshua T. Miller's body-worn-camera audio during the period preceding the audio mute, during which period Jeremy Miller was visible on body-worn-camera video in close proximity to Joshua T. Miller. Jeremy Miller therefore

possessed actual or constructive knowledge of the same-incident cross-complaint and the limitations of the complainants' video before the muted-audio deliberation window began.

45. On May 20, 2024, legal process was initiated against Plaintiff in case 24CR184.

46. As part of that legal process, Plaintiff was subjected to a probable-cause determination, bond conditions, a mandatory protection order naming Elizabeth French and Shaun Boughton, no-weapons conditions, firearm/ammunition relinquishment requirements, court appearances, and other restraints on liberty.

46A. Plaintiff was physically arrested on May 19, 2024, remained in FCSO custody when legal process was initiated on May 20, 2024, and was subjected to a court probable-cause determination, bond, mandatory protection order, no-weapons conditions, and firearm/ammunition relinquishment requirements before release. The May 20, 2024 legal-process event continued and transformed the initial warrantless seizure into a seizure pursuant to legal process for purposes of Plaintiff's Fourth Amendment malicious-prosecution / judicial-deception claim. See Mondragón v. Thompson, 519 F.3d 1078, 1083 (10th Cir. 2008); Wilkins v. DeReyes, 528 F.3d 790, 802 (10th Cir. 2008) (abrogated on other grounds by Thompson v. Clark, 596 U.S. 36 (2022)); Sanchez v. Hartley, 810 F.3d 750, 757–58 (10th Cir. 2016).

47. Defendants had access to or could readily access the body-worn-camera footage, reports, and other video evidence described above before Plaintiff's prosecution was allowed to continue.

48. Defendants either submitted, reviewed, approved, ratified, failed to correct, or failed to withdraw materially false or materially incomplete reports and probable-cause materials that caused Plaintiff's continued seizure and prosecution.

48A. Defendants' materially false or incomplete reports and probable-cause materials were a foreseeable and substantial cause of the prosecutor's charging decisions, the court's probable-cause determination, and the resulting legal-process restraints in 24CR184. Plaintiff alleges that any prosecutorial or judicial action was not an independent superseding cause because Defendants withheld, misstated, or failed to correct material facts necessary for an independent probable-cause assessment, including Plaintiff's pre-arrest attempt to identify and present exculpatory video, the refusal to review that video, the dispatch/cross-complaint information, the no-weapon pat-down, and the limitations of the complainants' video. See Pierce v. Gilchrist, 359 F.3d 1279, 1292–94 (10th Cir. 2004); Robinson v. Maruffi, 895 F.2d 649, 654–56 (10th Cir. 1990).

49. On October 9, 2025, the People moved to dismiss 24CR184 pursuant to the resolution of the separate 24CR271 prosecution, and the court granted that motion. No factual issue concerning the May 19, 2024 events was tried, stipulated to, or resolved on the merits before the 24CR184 prosecution ended. Plaintiff's seizure pursuant to the 24CR184 prosecution ended on October 9, 2025.

49A. The 24CR184 prosecution ended without a conviction on October 9, 2025, satisfying the favorable-termination element of Plaintiff's § 1983 Fourth Amendment malicious-prosecution claim.

(i) Thompson supplies the rule: a § 1983 Fourth Amendment malicious-prosecution plaintiff "need only show that the criminal prosecution ended without a conviction," Thompson v. Clark, 596 U.S. 36, 49 (2022); see also McDonough v. Smith, 588 U.S. 109, 119 (2019). The Tenth Circuit has expressly recognized that Thompson abrogated this Circuit's prior "indicative of innocence" line. Shrum v. Cooke, 60 F.4th 1304, 1311 (10th Cir. 2023) ("our precedents applying the favorable termination element are no

Page 30 of 80

longer good law"). The Court's October 9, 2025 Order to Dismiss in 24CR184 is unconditional on its face: no charge was preserved for refiling.

(ii) This is not a Newton v. Rumery release-dismissal. Rumery addresses agreements in which a criminal defendant releases civil claims against state actors in exchange for dismissal, and enforces them only after case-by-case scrutiny of voluntariness and public-interest justification. Town of Newton v. Rumery, 480 U.S. 386, 392, 398 (1987). No release exists here. The 24CR271 plea agreement (Sections I.2, I.5, II), the People's motion to dismiss 24CR184, and the Court's Order to Dismiss contain no release, covenant not to sue, waiver of § 1983 or state-law claims, or factual stipulation as to the May 19, 2024 events. The plea's factual basis describes only July 8, 2023 conduct involving different complainants and makes no reference to Boughton, French, or the May 19, 2024 events. Because no release was given or bargained for, Rumery's balancing inquiry is not triggered.

(iii) The two prosecutions were never consolidated; both dockets reflect "Related Cases: N/A." 24CR271 charged July 8, 2023 conduct involving different complainants; 24CR184 charged May 19, 2024 conduct involving French and Boughton. The plea's Section II factual basis liquidates only the July 8, 2023 conduct and admits nothing about the May 19, 2024 events. The 24CR184 prosecution accordingly "ended without a conviction" within the meaning of Thompson independent of the 24CR271 disposition. To the extent any defendant invokes Colorado common-law authorities for a "negotiated" or "compromise" dismissal qualifier, that doctrine does not control the federal element post-Thompson. See Shrum, 60 F.4th at 1311.

(iv) Pre-process theory preserved. Plaintiff's First Claim (pre-process Fourth Amendment seizure, May 19–20, 2024) is independently actionable regardless of how this Court

resolves favorable termination. *Wallace v. Kato*, 549 U.S. 384, 389–90 (2007); see ¶¶ 49B, 58A.

49B. Plaintiff's parallel state-law claims under C.R.S. § 13-21-131 (Fourth, Fifth, and Ninth Claims) do not require favorable termination as an element and are not subject to qualified immunity. C.R.S. § 13-21-131(2)(b). See ¶ 49A(iv)

50. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, arrest, jail detention, bond restrictions, a protection order, weapon-related restrictions, emotional distress, reputational harm, economic loss, defense costs, and other damages to be proven at trial. Plaintiff's damages include exacerbation of documented disability-related distress, trauma, and functional impairment caused by the arrest, criminal process, and retaliatory enforcement. Plaintiff's damages further include emotional distress, traumatic re-injury, and exacerbation of Plaintiff's documented PTSD and Conversion Disorder caused by the on-scene encounter itself, including the close-quarters and physically intimidating posture under which Defendants conducted the on-scene interrogation, and Plaintiff's reasonable fear during that encounter arising from Plaintiff's documented prior history of being targeted by FCSO personnel as a result of FCSO-associated complainants, see ¶¶ 51A–51I.

51. Before the May 19, 2024 arrest, Plaintiff engaged in a sustained course of protected First Amendment activity, including reporting alleged law-enforcement misconduct, complaining to government oversight agencies about that misconduct, preserving and offering video evidence, and announcing intended federal civil-rights litigation. That protected activity included, but was not limited to, the following written notices:

51A. On February 20, 2024 at 5:38 PM, Plaintiff sent a written notice via email, with Sheriff Allen Cooper of the Fremont County Sheriff's Office — the elected Sheriff and final policymaker for FCSO law-enforcement operations — as the named first recipient at

his official FCSO email address (allen.cooper@fremontso.com). The notice was simultaneously transmitted to additional FCSO personnel and entities, including Steve Sanger, Caleb Chase, Troy Johnston, Athena Garcia, Jordan Peters, and Defendant Joshua T. Miller individually at his official FCSO email address (joshua.miller@fremontso.com); to FCSO institutional addresses for Records and Internal Affairs; to three named clerks of the Fremont County Combined Courts; to the Colorado Attorney General's complaint office; to the United States Department of Justice Criminal Division; and to the Department of Homeland Security FEMA office. The subject line read: "Fremont, CO; Notice of Pending Federal Civil RICO Litigation." The notice expressly stated that Plaintiff intended to commence federal civil-rights litigation; identified specific FCSO personnel — including Defendant Joshua T. Miller by name — as anticipated defendants in that litigation; reported ongoing stalking and harassment at Plaintiff's residence; and identified Plaintiff's intent to seek redress through federal courts and oversight agencies. The body of the notice expressly identified Sheriff Cooper as the FCSO "Commanding Officer" and alleged that the misconduct described therein had been ongoing "without any response from" Cooper, placing Cooper on direct written notice that Plaintiff's anticipated federal civil-rights litigation encompassed both Defendant Joshua T. Miller's individual conduct and FCSO command-level inaction. The notice was, on its face and in its substance, protected speech and protected petitioning activity directed at law-enforcement misconduct. Cooper, FCSO, and Defendants neither acknowledged the notice nor took any investigative or corrective action with respect to its allegations during the 89-day interval between Plaintiff's transmission of the notice and Plaintiff's May 19, 2024 arrest.

51B. On May 3, 2024 at 4:38 PM, Plaintiff sent a follow-up written notice via email. The recipient list included FCSO command and personnel (Sheriff Allen Cooper, Steve Sanger, Caleb Chase, Troy Johnston, Athena Garcia, Jordan Peters, Defendant Joshua T. Miller, FCSO Records, and FCSO Internal Affairs); then-elected 11th Judicial District Attorney Linda Stanley by name; four named Colorado judicial-branch recipients (Robyn McPherson, Cynthia Banks, Christina Wilson, and Elizabeth Laughlin); and multiple state and federal oversight offices, including the Colorado Attorney General (Complaints, POST, and Certification), CBI, the U.S. Department of Justice Criminal Division, the Department of Homeland Security (FEMA, FLETC Directors Office, and FEMA Internal Affairs), the U.S. Department of Health and Human Services Office for Civil Rights, and the Small Business Administration. The May 3, 2024 notice identified Plaintiff's continuing reporting activity, included links to video evidence, and alleged that Plaintiff was being subjected to ongoing stalking, menacing, witness intimidation/retaliation, and related misconduct because of his efforts to report and preserve evidence of misconduct.

51C. Joshua T. Miller's individualized awareness of Plaintiff predated the February 20, 2024 notice. In 2023, in Fremont County Civil Case No. 23C1210, Joshua T. Miller personally served Plaintiff with a Civil Protection Order summons arising from the July 8, 2023 incident later charged in 24CR271. The terms of that 2023 Civil Protection Order were satisfied by Plaintiff without violation, and the Civil Protection Order matter concluded without incident in 2023.

51D. By February 20, 2024, when Plaintiff sent the written notice described in ¶ 51A, Joshua T. Miller had: (i) personally encountered Plaintiff in connection with the 23C1210 service; (ii) received Plaintiff's communications reporting stalking and harassment at

Plaintiff's residence; and (iii) received written notice — addressed to him individually by name and email — that Plaintiff intended to commence federal civil-rights litigation in which Joshua T. Miller would be named as an anticipated defendant. Each of these contacts gave Joshua T. Miller direct, personal, individualized awareness of Plaintiff's identity, residence, and protected reporting activity.

51E. Approximately 89 days after Plaintiff's February 20, 2024 written notice, on May 19, 2024, Joshua T. Miller responded to a complaint about Plaintiff's residence by arresting Plaintiff without reviewing Plaintiff's offered exculpatory video, omitting Plaintiff's contemporaneous cross-complaint of an armed pass-by from the probable-cause statement, and characterizing Plaintiff in the affidavit as a person who "seems to believe...the Fremont County Sheriff's Office is a Neo Nazi organization and is committing conspiracies against him" and who "seems to believe, anyone driving past his residence on the public roadway is there to intimidate and threaten him." The affiant did not invent this language. Sixteen days before the affidavit was sworn, Plaintiff's May 3, 2024 written notice — addressed to Joshua T. Miller individually by name and email (¶ 51B) — had described FCSO personnel as engaging in "racist, fascist, neo-nazi, ku-klux-klan" conduct and "Conspiracy" against Plaintiff. The probable-cause affidavit's 'Neo Nazi organization...committing conspiracies' framing took the very vocabulary Plaintiff had used in his protected reporting to Joshua T. Miller to accuse FCSO of misconduct, and inverted its evidentiary function by recasting Plaintiff's accusations as evidence of Plaintiff's purportedly paranoid belief, deployed in a sworn document to support a knowingly-false criminal process against Plaintiff. That characterization in the probable-cause affidavit directly tracked the substance of the protected complaints and reports Plaintiff had made to Joshua T.

Page 35 of 80

Miller and FCSO command in the months preceding the arrest. Joshua T. Miller used Plaintiff's protected reporting activity itself — Plaintiff's complaints about FCSO conduct toward him at his residence — as material in the probable-cause affidavit to suggest Plaintiff was unstable, hostile to law enforcement, and prone to misperceiving public-roadway traffic as threatening, thereby leveraging the protected activity to support the very legal process that effectuated the retaliation.

51F. The full retaliation chronology — February 20 notice, May 3 notice, May 19 arrest in 24CR184, July 22 warrant in 24CR271 — is set out at ¶¶ 51A, 51B, 51E, and 51G.

51G. Linda Stanley, the elected District Attorney for the 11th Judicial District whose office made the charging decisions in 24CR184 and 24CR271 during the relevant period, was a directly noticed recipient of Plaintiff's May 3, 2024 written notice (¶ 51B), and was later disbarred by order of the Office of the Presiding Disciplinary Judge of the Colorado Supreme Court entered September 27, 2024, nunc pro tunc to September 10, 2024, with the sanction of disbarment subsequently affirmed by the Colorado Supreme Court. People v. Stanley, 559 P.3d 697 (Colo. O.P.D.J. 2024), aff'd in part, rev'd in part sub nom. Matter of Stanley, 2025 CO 51, 576 P.3d 171. Plaintiff pleads Stanley's notice status and subsequent disbarment as evidence relevant to the awareness, at the office leadership level, of Plaintiff's intended federal civil-rights litigation and the overall condition of that office at the time the 24CR184 and 24CR271 charging decisions were made. Plaintiff does not name any prosecutor as a defendant, does not challenge the validity of the 24CR271 plea or deferred judgment in this action, and does not seek damages for the 24CR271 prosecution itself. The Heck-safe disclaimer at ¶ 53A is incorporated by reference.

51H. Plaintiff's protected reporting activity giving rise to this retaliation claim includes Plaintiff's complaints about FCSO's handling of a prior speech-based prosecution against him — People v. Sussman, Case No. 2022M000455, Fremont County Court, Hon. Alexandra Olsen Robak presiding — in which Plaintiff was charged under the "insults, taunts, and challenges" subsection of Colorado's harassment statute, C.R.S. § 18-9-111(1)(h). Body-worn-camera footage from that prior matter reflects Deputy Steve Sanger taking the complainant's statement; Plaintiff additionally reported concerns regarding Deputy Caleb Chase's response and Sergeant Troy Johnston's later communications with Plaintiff regarding Plaintiff's efforts to report or pursue charges. On December 16, 2022, defense counsel stated on the record that the case was "charged under a constitutionally infirm subsection of harassment statute," and the People (through Deputy District Attorney R. Kyle Ipson) acknowledged the constitutional question warranted further review. People v. Sussman, No. 2022M000455 (Fremont Cnty. Ct. Dec. 16, 2022) (certified transcript at 3). On January 27, 2023, the People moved to dismiss in the interest of justice; defense counsel did not object; the Court granted the motion and ordered the matter sealed. People v. Sussman, No. 2022M000455 (Fremont Cnty. Ct. Jan. 27, 2023) (certified transcript at 3).

51I. Plaintiff's May 3, 2024 written notice (¶ 51B) expressly identified Quinlan George Rasmussen, Julie Rasmussen, and Scott Rasmussen — the complainant and family members in the 2022M000455 matter — as among the individuals whose conduct Plaintiff was reporting, and identified Steve Sanger, Caleb Chase, Troy Johnston, and Alexandra Olsen Robak as among the FCSO and judicial-branch personnel whose handling of the prior speech-based prosecution Plaintiff was complaining about. The May 3 notice circulated to Joshua T. Miller and FCSO command therefore placed each

Defendant on actual or constructive notice that Plaintiff's complaints encompassed the prior speech-based prosecution and FCSO's role in it.

51J. Plaintiff does not rely solely on the temporal proximity between his February 20, 2024 and May 3, 2024 written notices and the May 19, 2024 arrest to plead retaliatory motive. In addition to that proximity (89 days and 16 days, respectively), Plaintiff alleges three contemporaneous and case-specific indicia of causation:

(i) the probable cause affidavit prepared by Defendant Joshua Miller affirmatively characterized Plaintiff's protected activity by content, describing Plaintiff as believing FCSO to be a "Neo Nazi organization" engaged in conspiracies — language that tracks the substance of Plaintiff's prior written complaints rather than any element of the alleged felony menacing offense;

(ii) the body-worn camera audio of Defendant Joshua Miller contains a deliberate, sustained mute spanning the post-complainant-interview, pre-Plaintiff-contact deliberation window during which any retaliatory deliberation among officers would have been captured, with video continuity confirming the device was operational and audio resuming after Joshua T. Miller had begun driving toward Plaintiff's residence but before any contact with Plaintiff; and

(iii) Defendant Speight failed to log into the FCSO Visual Labs body-worn camera system on May 19, 2024, producing no body-worn camera record of his participation in the encounter, contrary to the requirements of C.R.S. § 24-31-902 and FCSO policy.

51K. Plaintiff's burden at the pleading stage to allege that protected activity was a substantial or motivating factor in Defendants' adverse action is satisfied by the facts pleaded at ¶¶ 51A–51E and ¶ 25D, including absence of probable cause pleaded at ¶¶ 41, 41A, 42,

42C, 59, 60, 60A, and the Nieves comparator alternative pleaded at ¶¶ 108–108A. Plaintiff's pre-arrest written notices announcing intended federal civil-rights litigation against Defendant Joshua T. Miller individually are also a formal exercise of the Petition Clause right protected under Van Deelen v. Johnson, 497 F.3d 1151, 1155–56 (10th Cir. 2007), in which the Tenth Circuit held that filing or threatening to file civil-rights lawsuits is unqualifiedly protected petitioning activity, that "the petitioning clause of the First Amendment does not pick and choose its causes," id. at 1156, and that statements connecting that petitioning to retaliatory conduct establish retaliatory motive sufficient to defeat summary judgment.

52. The retaliatory-motive inference flowing from Defendants' May 19, 2024 conduct is pleaded at ¶ 106; the supporting chronology is at ¶¶ 51A, 51B, and 51E.

53. Plaintiff's protected activity included not only written complaints and notices, but also recording police interactions and incidents subsequently reported to police, preserving video evidence, offering video evidence to officers, reporting alleged criminal conduct by others, and petitioning government officials and oversight agencies for redress. Plaintiff pleads the 24CR271 matter only as background where necessary to show protected activity, notice, motive, or chronology, and does not seek damages in this action for any conviction, deferred judgment, or sentence in 24CR271.

53A. Plaintiff's claims in this action arise solely from Defendants' conduct on May 19, 2024 in connection with allegations made by Elizabeth French and Shaun Boughton, and from the resulting prosecution in 24CR184. None of the conduct alleged against Defendants in this Complaint is conduct that occurred during the July 2023 events underlying 24CR271, which involved different alleged victims and a separate factual basis. Plaintiff acknowledges that the deferred judgment entered in 24CR271 on

October 9, 2025 remains active through approximately October 9, 2029, and Plaintiff is in compliance with its terms. Plaintiff does not, in this action, challenge the validity of the 24CR271 plea, deferred judgment, or any term or condition imposed thereunder. Success on any claim pleaded herein would not require any finding inconsistent with the validity of that plea or judgment. *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). Specifically:

(i) Plaintiff is not asserting in this action that any conduct of Plaintiff constituting the offense conduct underlying 24CR271 was itself protected First Amendment activity;

(ii) Plaintiff's retaliation theory rests exclusively on Plaintiff's reporting, recording, evidence-preservation, and petitioning activity directed at law-enforcement misconduct, which is constitutionally protected regardless of the merits or outcome of the underlying July 2023 incident; and

(iii) success on any claim in this Complaint would not require the trier of fact to find that the 24CR271 conviction was wrongful, that the 24CR271 plea was invalid, or that any factual basis underlying the 24CR271 plea was untrue;

(iv) no factual finding required for any claim in this Complaint — including the First Amendment retaliation theory and the Equal Protection selective-enforcement theory — would be inconsistent with Plaintiff's plea or with the factual basis recited in the 24CR271 plea agreement. Plaintiff's retaliation theory targets Defendants' response to Plaintiff's protected reporting, recording, evidence-preservation, and petitioning activity, not the validity of the underlying July 8, 2023 investigation; Plaintiff's selective-enforcement theory concerns only the May 19, 2024 differential enforcement decision between Plaintiff and Boughton during a single call-for-service involving

entirely different complainants and an entirely different alleged incident than the conduct underlying 24CR271.

(v) Plaintiff does not seek any finding in this action that would collaterally challenge the validity of the 24CR271 plea, deferred judgment, or related proceedings. To the extent any factual finding in this action could have collateral-credibility implications for Joshua T. Miller as the arresting officer in 24CR271, Plaintiff does not rely on any such collateral effect as a basis for liability or damages, and Plaintiff's claims rest exclusively on the May 19, 2024 events and the subsequent 24CR184 prosecution and its continued-seizure consequences through October 9, 2025.

54. Plaintiff's May 3, 2024 notice was not merely a generalized complaint. It was directed to FCSO command, records, internal affairs, Defendant Joshua T. Miller, and several FCSO personnel publicly associated with prior federal civil-rights litigation involving Fremont County law-enforcement conduct. Public federal court records in O'Neal v. Board of County Commissioners of the County of Fremont, No. 1:16-cv-01005, identify Sheriff Allen Cooper, Troy Johnston, and Steve Sanger as defendants in a case involving alleged warrantless arrest, false arrest, First Amendment retaliation, excessive force, and privacy violations by Fremont County/FCSO personnel. Public federal court records in O'Neal further reflect that a jury returned verdicts in favor of O'Neal on false-arrest and First Amendment retaliation claims involving Johnston and Sanger, subject to the post-trial rulings entered in that case.

55. Plaintiff pleads the O'Neal matter and the prior Rasmussen matter solely as background for notice, motive, and absence of mistake.

56. Plaintiff alleges that Defendants' federal constitutional violations were not mere mistakes or negligent investigative omissions. Defendants acted intentionally, maliciously, and/or with reckless or callous indifference to Plaintiff's federally protected rights, including after

Page 41 of 80

receiving notice of Plaintiff's protected civil-rights activity, after Plaintiff offered readily available exculpatory video before arrest, and after the body-worn-camera and video evidence made the falsity of the 'no proof' narrative apparent.

57. By May 19, 2024, the rights at issue were clearly established. A reasonable officer would have known: (a) officers may not arrest without probable cause; (b) officers may not knowingly or recklessly omit material exculpatory facts from, or include materially misleading content in, probable-cause materials; (c) officers may not cause criminal process to continue through a false or incomplete narrative; (d) officers may not fabricate or maintain false evidence.

## FIRST CLAIM FOR RELIEF

### Fourth Amendment - Unreasonable Seizure / False Arrest / False Imprisonment

### (42 U.S.C. § 1983)

### Against Defendants Joshua T. Miller and Sergeant Uriah Cain Speight

58. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

58A. This Claim is asserted as a free-standing Fourth Amendment claim for the period of seizure from the warrantless arrest on May 19, 2024 through the initiation of legal process on May 20, 2024. The viability of this Claim does not depend on favorable termination of any subsequent prosecution. *See Wallace v. Kato*, 549 U.S. 384, 389–90 (2007). Plaintiff's damages for this pre-process seizure period are independently recoverable regardless of how the 24CR184 termination is later characterized for purposes of any post-legal-process malicious-prosecution claim.

59. Defendants Joshua T. Miller and Sergeant Uriah Cain Speight arrested, seized, or caused Plaintiff to be seized without a warrant and without probable cause, *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Cortez v. McCauley*, 478 F.3d 1108, 1116–17 (10th Cir. 2007) (en banc) (probable cause exists where the facts and circumstances within the officers' knowledge, and of which they had reasonably trustworthy information, would warrant a prudent officer in believing the suspect had committed or was committing a crime).

59A. Defendant Speight personally participated in the warrantless seizure of Plaintiff. After Joshua T. Miller announced the arrest decision described at ¶ 32, Speight physically held Plaintiff's arm during the application of handcuffs by Joshua T. Miller, physically escorted Plaintiff from the location of the arrest to Joshua T. Miller's patrol vehicle, and physically placed Plaintiff in the rear of that patrol vehicle. Speight's physical conduct is captured on Joshua T. Miller's body-worn-camera video, See Joshua Miller BWC Video. Speight's conduct constitutes the application of physical force effecting a Fourth Amendment seizure of Plaintiff under *California v. Hodari D.*, 499 U.S. 621, 626 (1991), independent of and in addition to Joshua T. Miller's conduct. Speight effected this seizure with full knowledge of the deficiencies in the probable-cause record described at ¶¶ 25C, 41A, and 42C, and notwithstanding Speight's own awareness that Speight had produced no body-worn-camera footage of his own perspective on the encounter, see ¶¶ 25, 25A.

60. No reasonable officer could conclude probable cause existed while refusing Plaintiff's request to view the complainants' video Defendants were relying upon, providing Plaintiff no opportunity to display the contemporaneous video evidence in his possession depicting Boughton's pistol-pointing during the OHV second pass, and disregarding French's twofold express

admission that she did not know whether Plaintiff was pointing the firearm at her. This is especially so where: (a) Miller's own account of the complainants' video showed only a 'dark object'; (b) Miller's sworn probable-cause affidavit contained a parenthetical acknowledgment that he 'did not see any pistols being pointed at Mr. Sussman in the video'; (c) Plaintiff had separately reported through dispatch that a neighbor was driving around in an OHV 'waving a gun'; and (d) Plaintiff had no weapon on his person after the pat-down. Defendants' refusal to review Plaintiff's offered, immediately available exculpatory video, while contemporaneously crediting the reporting parties' incomplete 'dark object' video, constituted wholesale delegation of the constitutional duty to make an independent probable-cause determination, in violation of Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10th Cir. 1998), and Maresca v. Bernalillo County, 804 F.3d 1301, 1310–11 (10th Cir. 2015) (officers charged with knowledge of readily available exculpatory evidence they unreasonably fail to ascertain).

60A. Nor did the corrected facts establish probable cause or arguable probable cause for any other offense known to Defendants at the time of arrest. The alleged weapon-related event was over; Plaintiff was at his residence; Plaintiff had been patted down and had no weapon on his person; Plaintiff was surrounded by officers; Plaintiff was reporting a same-incident armed pass-by by the reporting parties; and Defendants, having already reviewed the complainants' video at 92 Carpenter Trail less than a quarter-mile away before contacting Plaintiff, possessed the practical investigatory ability to make that video available to Plaintiff at the scene — whether by returning briefly to 92 Carpenter Trail, requesting an immediate transmission from the complainants, or pausing the encounter pending its retrieval — and likewise possessed the practical ability to permit Plaintiff to display Plaintiff's own contemporaneous video on Plaintiff's recording device, which was readily available at the scene. Under those corrected facts, no

reasonable officer could treat the reporting parties' incomplete or disputed narrative as probable cause for felony menacing or any alternative arrest offense, *See Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004) (probable cause may rest on any offense for which there is probable cause at the time of arrest, even if not the offense charged).

61. Under Pahls v. Thomas, 718 F.3d 1210, 1225–28 (10th Cir. 2013), each Defendant named in this Claim is liable for his own conduct, not for the conduct of others; the personal-participation allegations as to each Defendant are set forth at ¶¶ 62, 62A.

62. Joshua T. Miller directly participated in the constitutional violation by arresting Plaintiff after refusing to review the exculpatory video and after omitting Plaintiff's offer from the probable-cause narrative.

62A. Speight directly participated in the constitutional violation by physically effecting Plaintiff's seizure as described at ¶ 59A and by his presence and participation in the muted-audio strategy-discussion window described at ¶¶ 25C(vii)–(viii), 25D, during which the no-probable-cause arrest decision was reached. Speight effected the physical seizure of Plaintiff with full knowledge of the deficiencies in the probable-cause record and despite Speight's own awareness that no body-worn-camera footage from Speight's perspective had been preserved.

63. Plaintiff's detention without legal process began upon his warrantless seizure on May 19, 2024 and continued until legal process was initiated on May 20, 2024. The constitutional violations alleged in this Claim, and the damages flowing from them for the pre-process seizure period, are complete as of May 20, 2024 and do not depend on the disposition of 24CR184.

64. The conduct of Defendants Joshua T. Miller and Speight violated Plaintiff's rights under the Fourth Amendment.

65. As a direct and proximate result of that conduct, Plaintiff suffered damages.

## SECOND CLAIM FOR RELIEF

**Fourth Amendment - Malicious Prosecution / Judicial Deception / Unlawful Seizure Pursuant to Legal Process (42 U.S.C. § 1983)**

**Against Defendants Joshua T. Miller, Sergeant Uriah Cain Speight, and Deputy Jeremy Miller**

66. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

67. Joshua T. Miller caused Plaintiff's continued seizure and prosecution by preparing, swearing out, submitting, and maintaining a materially false and/or materially incomplete probable-cause statement. The 24CR184 court record reflects that on May 20, 2024 an Affidavit in Support of Warrantless Arrest was filed (docket code ASWA) and the court entered an order finding probable cause based on that affidavit, reflected in the docket as "Ruling: Probable Cause Found, Document Title: Order: Affidavit In Support Of Warrantless Arrest." That filing and the resulting probable-cause determination, the issuance of bond conditions, the entry of a mandatory protection order naming French and Boughton, and the imposition of firearm-relinquishment requirements collectively constituted the initiation of legal process against Plaintiff. The probable-cause narrative supporting that legal process — prepared, sworn, and submitted by Defendant Joshua T. Miller — is the materially false and incomplete statement described in this Claim. The warrantless character of the May 19, 2024 arrest is immaterial to this Claim, which targets the seizure-pursuant-to-legal-process predicated on the materially false and incomplete probable-cause record described in ¶¶ 41, 41A, 41B, 69, and 70. See Wilkins v. DeReyes, 528 F.3d 790, 802 (10th Cir. 2008) (abrogated on other grounds by Thompson v. Clark, 596 U.S. 36 (2022)); Sanchez v. Hartley, 810 F.3d 750, 757–58 (10th

Cir. 2016). Plaintiff's separate satisfaction of Thompson's favorable-termination element is pleaded at ¶ 49A.

68. The causation chain between the materially false probable-cause statement and the resulting legal-process restraints is pleaded at ¶ 48A.

69. Speight caused Plaintiff's continued seizure and prosecution by authoring, approving, reviewing, or ratifying a supplemental narrative falsely stating that Plaintiff had no proof, despite being present, despite the dispatch/cross-complaint information, despite the no-weapon pat-down, and despite Joshua Miller's body-worn camera capturing the interaction. Plaintiff invokes the federal common-law spoliation inference set forth in ¶ 25B as the primary basis for the materiality of Defendants' false or incomplete reports for the purposes of this Claim, and additionally invokes the statutory permissive inference under C.R.S. § 24-31-902(1)(a)(III) as a supplemental basis. Defendants' false or incomplete reports and omissions were material to the legal process because they were reasonably likely to influence prosecutors and the court in 24CR184. Speight authored or ratified the false "no proof" narrative notwithstanding Joshua T. Miller's contemporaneous on-camera misrepresentation to Plaintiff that both officers' body-worn cameras were recording, see ¶ 25D, and notwithstanding Speight's own awareness that no body-worn-camera footage from Speight's perspective had been preserved.

70. If the false statements were removed and the omitted facts were added - including that Plaintiff possessed contemporaneous video showing Shaun Boughton pointing a gun at him, Plaintiff attempted to identify and offer that video at the scene, Plaintiff requested to view the complainants' video and was refused by Joshua T. Miller, French herself twice expressly disclaimed knowledge of whether Plaintiff was pointing the firearm at her, Plaintiff had no weapon on his person, the complainants' own video showed only a "dark object," and the

complainants' own video did not show what Defendants later implied - probable cause would not have existed.

71. Case 24CR184 terminated in Plaintiff's favor when it was dismissed on October 9, 2025, without a conviction in that case.

  71A. Plaintiff's satisfaction of the federal favorable-termination element is pleaded at ¶ 49A, including the express distinction from Newton v. Rumery, 480 U.S. 386 (1987), and the express recognition of Thompson v. Clark, 596 U.S. 36 (2022).

  71B. The Fourth Amendment seizure underlying this Claim, its favorable-termination element, and Plaintiff's alternative pre-process theory in the event the 24CR184 dismissal is not deemed favorable termination, are pleaded at ¶¶ 49–49B and at ¶ 58A (First Claim, pre-process seizure period), and are incorporated by reference.

72. Defendants acted intentionally, with reckless disregard for the truth, and with malice toward Plaintiff's federally protected rights. Each Defendant subjectively perceived the risk that arresting Plaintiff and maintaining a false or incomplete probable-cause narrative would deprive Plaintiff of his constitutional rights, and proceeded anyway. Smith v. Wade, 461 U.S. 30, 56 (1983). Plaintiff incorporates the subjective-awareness factual basis pleaded at ¶ 110A as supporting reckless or callous indifference under Smith v. Wade on this Claim.

73. The conduct of Joshua T. Miller, Speight, and Deputy Jeremy Miller violated Plaintiff's rights under the Fourth Amendment.

74. As a direct and proximate result of that conduct, Plaintiff suffered damages, including damages from seizure pursuant to legal process from May 20, 2024 through dismissal on October 9, 2025.

## THIRD CLAIM FOR RELIEF

Page 48 of 80

**Failure to Intervene in Fourth Amendment Violations (42 U.S.C. § 1983)**

**Against Defendants Uriah Cain Speight and Jeremy Miller**

75. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

76. Joshua T. Miller committed the constitutional violations described in the First and Second Claims.

77. Speight observed or had reason to know that Joshua T. Miller was arresting Plaintiff without probable cause and/or creating or maintaining a materially false narrative about Plaintiff's claimed lack of proof.

78. Speight had a realistic opportunity to intervene before or during the arrest and before the false or misleading reporting was finalized, including by requiring review of Plaintiff's offered video, requiring a fuller investigation, ensuring the no-weapon pat-down and dispatch/cross-complaint facts were documented, or stopping the arrest pending review of the readily available exculpatory video.

    78A. Bledsoe v. Carreno, 53 F.4th 589 (10th Cir. 2022), expressly recognized the duty of officers actively involved in an investigation to intervene against fabrication and judicial deception by fellow officers, and held that this duty extended beyond the excessive-force context. Conduct occurring after the date of the Bledsoe decision (November 15, 2022) is therefore squarely governed by clearly established law on the duty to intervene. Speight's conduct on May 19, 2024 occurred eighteen months after Bledsoe.

    78B. The duty to intervene to prevent or stop ongoing constitutional violations is well established in this Circuit. See Estate of Booker v. Gomez, 745 F.3d 405, 422 (10th Cir.

2014); Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008); Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996); Bledsoe v. Carreno, 53 F.4th 589, 612–14 (10th Cir. 2022).

79. Speight failed to intervene. Speight's BWC failure is material to the failure-to-intervene claim because Speight was present, failed to preserve required recording from his own perspective, knew or had reason to know that Joshua Miller's body camera captured the interaction, and nevertheless failed to stop or correct the false narrative that Plaintiff had no proof. Plaintiff invokes the federal common-law spoliation principles set forth in ¶ 25B as the primary basis for an adverse inference at the appropriate stage, and additionally invokes the statutory permissive inference under C.R.S. § 24-31-902(1)(a)(III) as a supplemental basis.

80. Independently and not in the alternative, Deputy Jeremy Miller observed or had reason to know during the muted-audio strategy-discussion window described at ¶¶ 25C(vii)–(viii), 25D, 44 that Joshua T. Miller and Speight were causing or about to cause Plaintiff to be arrested without probable cause and were creating or maintaining a materially false or incomplete probable-cause narrative; Jeremy Miller had a realistic opportunity during that deliberation window to require review of available evidence, require a fuller investigation, dissent from the no-probable-cause arrest decision, or insist that material exculpatory facts be documented before the arrest proceeded; and Jeremy Miller failed to intervene.

81. The failure to intervene violated Plaintiff's rights under the Fourth Amendment.

82. As a direct and proximate result of the failure to intervene, Plaintiff suffered damages.

## FOURTH CLAIM FOR RELIEF

### C.R.S. § 13-21-131 - Colorado Constitution Article II, Section 7 - Unreasonable Seizure / False Arrest / Judicial Deception

Page 50 of 80

**Against Defendants Joshua T. Miller, Sergeant Uriah Cain Speight, and Deputy Jeremy Miller**

83. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

83A. Claims brought under C.R.S. § 13-21-131 are not subject to the federal qualified immunity defense. C.R.S. § 13-21-131(2)(b) provides that "[q]ualified immunity is not a defense" to a claim brought under that statute. Plaintiff pleads this state-law claim as an independent basis for liability that proceeds without regard to the qualified immunity analysis applicable to Plaintiff's federal § 1983 claims. The Colorado Court of Appeals has held that a § 13-21-131 plaintiff alleging a constitutional violation under Article II, § 7 through a tainted affidavit must prove that the affidavit's misstatements or omissions were intentional or made with reckless disregard for the truth, and that the corrected affidavit would not have established probable cause. *Johnson v. Staab*, 2025 COA 45, ¶¶ 31–32, 34, 571 P.3d 939, 945–46. Plaintiff so alleges as to each Defendant in ¶¶ 41, 41A, 41B, 42C, 70, 88, and 89.

83B. Plaintiff's claim under C.R.S. § 13-21-131 is brought against Defendants in their individual capacities and is not subject to the notice-of-claim requirements of the Colorado Governmental Immunity Act, C.R.S. §§ 24-10-101 *et seq.* C.R.S. § 13-21-131(2)(b) provides on its face that "[q]ualified immunity is not a defense" to a § 13-21-131 claim and that the statute creates a free-standing private right of action against peace officers in their individual capacities, separate from CGIA-governed claims against public entities. To the extent any pre-suit notice requirement is later determined to apply, Plaintiff alleges in the alternative that his May 3, 2024 written notice to FCSO command, his subsequent oversight-agency complaints, and the underlying litigation in 24CR184 collectively satisfy the substance of any such

requirement. See also *Weise v. Colorado Springs*, 421 F. Supp. 3d 1019, 1033–34 (D. Colo. 2019) (state-created immunity doctrines do not bar federal constitutional claims under 42 U.S.C. § 1983) (citing *Martinez v. California*, 444 U.S. 277 (1980)).

83C. Plaintiff alleges personal participation by each Defendant in the conduct giving rise to each § 13-21-131 claim under the same personal-participation framework set forth at ¶ 14A. The personal-participation allegations as to each Defendant are set forth at ¶¶ 42B, 43, 44, 61–62, 67, 69, 77–79, 86–87, 94–97, 114–116, and 137.

84. At all relevant times, Defendants were peace officers acting under color of law.

85. Article II, Section 7 of the Colorado Constitution protects Plaintiff from unreasonable searches and seizures and from seizure based on materially false or materially incomplete probable-cause materials.

86. Defendants Joshua T. Miller and Speight subjected Plaintiff, or caused Plaintiff to be subjected, to an unreasonable seizure under Article II, Section 7 by seizing or causing Plaintiff to be seized without a warrant and without probable cause, including by Speight's physical conduct effecting the seizure as described at ¶¶ 59A, 62A.

86A. Justification for a warrantless arrest under Article II, § 7 is an affirmative defense that Defendants bear the burden of proving. Cf. Mosley v. Daves, 2025 COA 80, ¶¶ 22–27, 580 P.3d 584 (holding that in the warrantless-search context, justification is an affirmative defense on which the government bears the burden under C.R.S. § 13-21-131). Warrantless arrests are seizures within the same Article II, § 7 framework as warrantless searches, and § 13-21-131's burden-allocation principles therefore apply equally to both.

87. Defendants Joshua T. Miller and Sergeant Uriah Cain Speight subjected Plaintiff, or caused Plaintiff to be subjected, to continued seizure and prosecution under Article II, Section 7 by intentionally or recklessly preparing, submitting, reviewing, approving, or maintaining materially false or materially incomplete probable-cause materials. Deputy Jeremy Miller subjected Plaintiff, or caused Plaintiff to be subjected, to continued seizure and prosecution by intentionally or recklessly failing to correct or intervene to prevent the submission of those materially false or materially incomplete probable-cause materials despite his contemporaneous awareness of their falsity or incompleteness.

88. This claim is not based on negligence, mistake, or a mere failure to investigate. Plaintiff alleges intentional or reckless disregard for the truth, including refusal to review readily available exculpatory video, omission of Plaintiff's pre-arrest offer to show that video, omission or misstatement of the no-weapon pat-down and dispatch/cross-complaint context, and the false or misleading report narrative that Plaintiff had no proof. In tainted-affidavit cases under Article II, § 7 actionable through C.R.S. § 13-21-131, the Colorado Court of Appeals has held that the plaintiff must prove that the affidavit's misstatements or omissions were intentional or made with reckless disregard for the truth, and that the corrected affidavit would not have established probable cause. *Johnson v. Staab*, 2025 COA 45, ¶¶ 31–32, 34, 571 P.3d 939, 944–46. Plaintiff so alleges as to each Defendant. *Staab* does not foreclose other state-of-mind theories for non-tainted-affidavit violations of Article II, § 7, but Plaintiff's principal Article II, § 7 theory is the tainted-affidavit theory addressed in *Staab*, and Plaintiff alleges that standard is satisfied as to each Defendant.

89. If the false statements were removed and the omitted facts were added, probable cause would not have existed for Plaintiff's arrest, continued seizure, or prosecution. Recklessness may be inferred from circumstances evincing obvious reasons to doubt the complainants' veracity.

Johnson v. Staab, 2025 COA 45, ¶ 40; Beard v. City of Northglenn, 24 F.3d 110, 116 (10th Cir. 1994). Plaintiff incorporates ¶¶ 25D, 41, 41A, and 110A in support.

90. Defendants' conduct deprived Plaintiff of rights secured by Article II, Section 7 of the Colorado Constitution and made Defendants liable under C.R.S. § 13-21-131.

91. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages and is entitled to legal, equitable, and other appropriate relief.

91A. Defendants' deprivation of Plaintiff's rights under Article II, Section 7 of the Colorado Constitution was further supported by Speight's failure to comply with Colorado's body-worn-camera requirements during the encounter. Plaintiff invokes the federal common-law spoliation inference set forth in ¶ 25B as the primary basis for an adverse inference that Speight's missing footage would have reflected the conduct alleged in this Complaint. Plaintiff additionally invokes the statutory permissive inference under C.R.S. § 24-31-902(1)(a)(III) as a supplemental basis for the same inference. As to the C.R.S. § 13-21-131 claims specifically, Under Colorado spoliation law, an adverse-inference instruction is available where a party willfully destroys or fails to preserve evidence the party knew or should have known would be relevant to litigation. Aloi v. Union Pacific R.R. Co., 129 P.3d 999, 1002–03 (Colo. 2006). The Colorado Supreme Court has since clarified that the duty to preserve evidence arises whenever a party knows or should know that (1) litigation is pending or reasonably foreseeable and (2) the evidence is relevant to that litigation. Terra Mgmt. Grp., LLC v. Keaten, 2025 CO 40, ¶ 44, 572 P.3d 126; see also Warembourg v. Excel Elec., Inc., 2020 COA 103, ¶¶ 61–62, 471 P.3d 1213, 1225. Plaintiff alleges willfulness as to Defendant Speight's failure to log into the Visual Labs application during a required law-enforcement

encounter (¶¶ 25A, 25C) and as to Defendant Joshua T. Miller's deliberate audio mute during the deliberation window (¶ 25D).

## FIFTH CLAIM FOR RELIEF

### C.R.S. § 13-21-131 - Failure to Intervene - Colorado Constitution Article II, Section 7

### Against Defendants Uriah Cain Speight and Jeremy Miller

92. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

    92A. The qualified-immunity bar applicable to claims under C.R.S. § 13-21-131 is pleaded at ¶ 83A and incorporated herein.

93. At all relevant times, Speight and Deputy Jeremy Miller were peace officers acting under color of law.

94. Speight knew or had reason to know that Joshua T. Miller was depriving Plaintiff of rights secured by Article II, Section 7 of the Colorado Constitution by arresting Plaintiff without probable cause and/or creating or maintaining a materially false or incomplete probable-cause narrative.

95. Speight had a realistic opportunity to intervene, to prevent, or to limit the deprivation, including by requiring review of Plaintiff's offered video, requiring a fuller investigation, ensuring exculpatory facts were documented, or stopping the arrest or false reporting from proceeding.

96. Speight failed to intervene and thereby subjected or caused Plaintiff to be subjected to the deprivation of Article II rights within the meaning of C.R.S. § 13-21-131.

97. Independently and not in the alternative, Deputy Jeremy Miller knew or had reason to know during the muted-audio strategy-discussion window described at ¶¶ 25C(vii)–(viii), 25D, 44

that Joshua T. Miller and Speight were depriving Plaintiff of rights secured by Article II, Section 7 of the Colorado Constitution, had a realistic opportunity to intervene during that deliberation window, and failed to do so.

98. The failure to intervene by each of Speight and Jeremy Miller deprived Plaintiff of rights secured by Article II, Section 7 of the Colorado Constitution and made each liable under C.R.S. § 13-21-131.

99. As a direct and proximate result of the failure to intervene, Plaintiff suffered damages and is entitled to legal, equitable, and other appropriate relief, including costs and any recoverable fees, including attorney fees incurred if Plaintiff is represented by counsel at any stage, as provided by C.R.S. § 13-21-131. *See Mosley v. Daves*, 2025 COA 80, 580 P.3d 584 (applying the § 13-21-131(3) attorney-fee framework).

## SIXTH CLAIM FOR RELIEF

### First Amendment Retaliation / Retaliatory Arrest and Retaliatory Criminal Process

### 42 U.S.C. § 1983

### Against Defendants Joshua T. Miller, Sergeant Uriah Cain Speight, and Deputy Jeremy Miller

100. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

101. Plaintiff engaged in activity protected by the First Amendment, including reporting alleged law-enforcement misconduct, recording activity protected by the First Amendment, preserving and offering video evidence, submitting written complaints and notices to government officials and oversight agencies, petitioning for redress of grievances, and notifying FCSO personnel of Plaintiff's intent to pursue civil-rights remedies.

102. Plaintiff's February 20, 2024 written notice (¶ 51A) and May 3, 2024 follow-up notice (¶ 51B) were both sent directly to Sheriff Allen Cooper as named first recipient, to Defendant Joshua T. Miller individually, and to FCSO command, records, and internal-affairs personnel, among others. Both notices identified Plaintiff's intended federal civil-rights litigation, and the May 3 notice included links to video evidence and was further addressed to then-elected 11th Judicial District Attorney Linda Stanley by name.

103. Sixteen days later, on May 19, 2024, Joshua T. Miller, Speight, and Deputy Jeremy Miller participated in the encounter that resulted in Plaintiff's warrantless arrest in 24CR184.

104. As to Defendant Joshua T. Miller, knowledge is direct, individualized, longstanding, and documented. Joshua T. Miller had personally served Plaintiff with a Civil Protection Order summons in 2023 in Fremont County Civil Case No. 23C1210; the terms of that civil order were satisfied by Plaintiff without violation, and the matter concluded without incident. Between approximately October 2023 and May 2024, Plaintiff sent numerous communications directly to Joshua T. Miller reporting stalking and harassment at Plaintiff's residence; Joshua T. Miller received those communications, conducted no investigation, authored no reports memorializing the communications, and made no substantive response. On February 20, 2024, Joshua T. Miller was a named, individually addressed recipient of Plaintiff's written notice expressly announcing intended federal civil-rights litigation in which Joshua T. Miller was identified by name as an anticipated defendant. On May 3, 2024, Joshua T. Miller was again a named, individually addressed recipient of follow-up written notice. Joshua T. Miller's knowledge of Plaintiff's identity, residence, and protected reporting activity was therefore continuous, personal, documented in writing, and pre-existed the May 19, 2024 arrest by approximately 89 days as to the federal-litigation announcement and by more than seven months as to the stalking-report communications.

104A. Independently and in the further alternative, Plaintiff alleges that Speight and Jeremy Miller had constructive or imputed knowledge of the May 3, 2024 written notice through ordinary FCSO information-flow channels, because the notice was directed not only to Joshua T. Miller individually but to FCSO command, FCSO Records, FCSO Internal Affairs, and FCSO personnel publicly associated with prior federal civil-rights litigation. Plaintiff's First Amendment retaliation claim against Speight and Jeremy Miller does not depend on their pre-encounter awareness of the May 3 notice; their on-scene observation of Plaintiff's protected activity on May 19, 2024 is independently sufficient. The on-scene-participation framework directly supports retaliation pleading against co-defendant officers in this District. *See* Sodaro v. City & Cnty. of Denver, 629 F. Supp. 3d 1064, 1075–76 (D. Colo. 2022) (denying MTD as to officers who discussed the incident with the arresting officer and shared knowledge of facts relevant to probable cause, while dismissing claim against officer with no alleged participation in arrest decision or seizure). Each of Plaintiff's three categories of on-scene First Amendment activity was independently protected and clearly established at the time of the May 19, 2024 arrest:

(i) Plaintiff's recording activity was clearly established protected activity under Irizarry v. Yehia, 38 F.4th 1282, 1289–95 (10th Cir. 2022). To the extent any portion of Plaintiff's recording activity is properly characterized as recording of private actors rather than police activity, that activity is independently protected as First Amendment evidence-gathering and speech on matters of public concern;

(ii) Plaintiff's on-scene verbal communications to Defendants comprised three distinct categories of protected First Amendment activity, each independently and clearly established at the time:

(a) Plaintiff's citizen complaint reporting Boughton's alleged armed misconduct against Plaintiff during the OHV pass-by, which is protected speech on a matter of public concern and protected petitioning of government for redress of grievances under the Petition Clause, see Borough of Duryea v. Guarnieri, 564 U.S. 379, 387–88 (2011);

(b) Plaintiff's verbal challenge to Defendants' on-scene conduct, including statements characterizing Defendants' conduct as unlawful, which is protected criticism of police officers under City of Houston v. Hill, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); and

(c) Plaintiff's express on-scene invocation of First Amendment protection, see ¶ 104B, which is itself protected speech; and

(iii) Plaintiff's offer of exculpatory video derived from the same right-to-record recognized in Irizarry and from the right to petition the government for redress of grievances, U.S. Const. amend. I. The First Amendment retaliation elements applied to each category are set forth in Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000). The same conduct also falls within the obvious-case doctrine of *Hope v. Pelzer*, 536 U.S. 730 (2002), and *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam).

104B. During the May 19, 2024 encounter at Plaintiff's residence, on Joshua T. Miller's body-worn-camera audio and in the on-scene presence of Defendants Joshua T. Miller and Speight, Plaintiff expressly invoked First Amendment protection, stating words to the effect of: "This is a violation of my First Amendment right to free speech and to petition the government for redress of grievances without interference." Plaintiff's express invocation gave Defendants Joshua T. Miller and Speight contemporaneous,

on-scene, audible notice that Plaintiff was claiming the encounter implicated First Amendment-protected activity. Notwithstanding that express invocation, Joshua T. Miller proceeded to announce the arrest decision described at ¶ 32 and to author the materially false probable-cause statement described at ¶¶ 41, 41A, 67; Speight effected the physical seizure described at ¶ 59A and authored or ratified the materially false "no proof" supplemental report described at ¶¶ 25C(v), 69. As to Defendant Jeremy Miller, the on-scene First Amendment invocation supplements rather than substitutes for the basis of Jeremy Miller's subjective awareness alleged at ¶¶ 25C(vii)–(viii), 25D, 44, 80, 97; Plaintiff alleges that Jeremy Miller was constructively or imputedly aware of Plaintiff's express prior First Amendment invocation through ordinary FCSO information-flow channels available to him and through subsequent debriefing among the three Defendants following the arrest.

105. Defendants took adverse actions against Plaintiff that would chill a person of ordinary firmness from continuing to engage in the protected speech, recording, reporting, evidence preservation, petitioning activity, and intended litigation at issue in this Complaint. Those adverse actions included refusing Plaintiff's request to view the complainants' video Defendants were relying upon, providing Plaintiff no opportunity to display the contemporaneous video evidence in his possession, and disregarding French's express twofold admission that she did not know whether Plaintiff was pointing the firearm at her, arresting Plaintiff without probable cause, creating or maintaining a materially false "no proof" narrative, omitting Plaintiff's offered video from probable-cause materials, conducting or permitting a bad-faith investigation, causing or permitting prosecution and criminal process to continue, and using legal process in a manner that constituted legal harassment and retaliatory criminal enforcement.

106. Defendants' adverse actions were substantially motivated by Plaintiff's protected activity, as shown by the close timing between Plaintiff's February 20, 2024 and May 3, 2024 written notices and the May 19, 2024 arrest; the fact that Joshua T. Miller was a direct recipient of the notice; the notice's circulation to FCSO command, records, and internal affairs; the notice's express inclusion of protected federal civil-rights litigation and evidence preservation claims; Plaintiff's prior complaints concerning an earlier free-speech-based harassment charge against Plaintiff that was filed by Quinlan George Rasmussen with the involvement of former FCSO Deputy Steve Sanger and subsequently dismissed as infirm and as a free speech matter. Defendants' refusal of Plaintiff's request to view the complainants' video Defendants were relying upon, Defendants' failure to provide Plaintiff any opportunity to display the contemporaneous video evidence in Plaintiff's possession, Defendants' disregard for French's twofold express disclaimer of knowledge that Plaintiff was pointing the firearm at her; the false or misleading written assertion that Plaintiff had no proof; Defendants' failure to fairly investigate Plaintiff's cross-complaint; the bad-faith investigative choice to credit the reporting parties while refusing to view Plaintiff's offered video; same-incident differential treatment between Plaintiff and Shaun Boughton; the resulting legal harassment through arrest, bond conditions, protection-order restrictions, firearm/ammunition restrictions, and continued criminal process; and recorded statements reflecting hostility toward Plaintiff, a predetermined decision to treat Plaintiff as the problem rather than as a reporting party, and reliance on unsubstantiated or uncharged allegations relating to other unrelated incidents instead of the evidence available during the May 19, 2024 encounter. See Joshua Miller BWC Video "OK, Max, I don't think we're going to get anywhere with this, so I'm going to ask you to just turn around and put your hands behind your back, OK? You're under arrest for felony menacing." Joshua T. Miller's announcement of the arrest decision was made not in response to any

inculpatory statement by Plaintiff but in response to Plaintiff's continued assertion of his rights and his contemporaneous express invocation of the First Amendment, see ¶ 104B.

107. The absence of probable cause for the May 19, 2024 arrest and for the continued criminal process is pleaded at ¶¶ 41, 41A, 42C, 60, 60A, 70, and 89; the Nieves carve-out alternative is pleaded at ¶¶ 108–108A. See Nieves v. Bartlett, 587 U.S. 391, 404–07 (2019); Becker v. Kroll, 494 F.3d 904, 925 (10th Cir. 2007).

108. In the alternative, to the extent Defendants contend that arguable or actual probable cause existed for Plaintiff's arrest, Plaintiff alleges that the probable-cause carve-out announced in *Nieves v. Bartlett*, 587 U.S. 391, 406–07 (2019), does not bar Plaintiff's First Amendment retaliation claim. *Nieves* recognized an exception when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. 587 U.S. at 407. The Supreme Court has since confirmed that the *Nieves* exception is not limited to virtually identical comparators; the only express limit on the kind of evidence a plaintiff may present to satisfy the exception is that it must be objective. *Gonzalez v. Trevino*, 602 U.S. 653, 657–58 (2024) (per curiam). Plaintiff presents such objective comparator evidence here.

108A. During the same law-enforcement response on May 19, 2024, Plaintiff and Shaun Boughton were both alleged participants in the same weapon-related encounter. Plaintiff reported that Boughton pointed a gun at Plaintiff while driving the OHV/side-by-side; Plaintiff possessed contemporaneous video evidence corroborating that report and attempted to identify and offer that evidence to Defendants at the scene (¶¶ 28–29); Plaintiff requested on-scene to view the complainants' video Joshua T. Miller had identified as the basis for the allegations, Joshua T. Miller refused; and Defendants did not provide Plaintiff any opportunity to display the contemporaneous

video evidence in Plaintiff's possession depicting Boughton's pistol-pointing during the OHV second pass. Defendants nevertheless arrested Plaintiff while taking no comparable enforcement action against Boughton — no comparable detention, no comparable arrest, no comparable officer-initiated report or referral for weapon-related charges, and no comparable process exposing Boughton to protection-order or firearm/ammunition-relinquishment consequences. Boughton was a similarly situated comparator who was not engaged in the same protected reporting, recording, evidence-preservation, and petitioning activity as Plaintiff. The differential enforcement decision during a single call-for-service is the kind of objective same-incident comparator evidence that the *Nieves* exception contemplates. The first pass — slow, with engine revving — and French's own twofold admission, both in her 911 call and in her subsequent interview with Joshua T. Miller (see ¶ 39B(ii)), that she did not know whether Plaintiff was pointing the firearm at her — directly contradicting her earlier cellphone-video narration misrepresentation — are independently relevant as evidence undermining the complainants' good-faith and contemporaneous-fear narrative, supporting the inference that Defendants' decision to credit Boughton over Plaintiff was made in the face of objective same-incident facts that should have prompted parallel scrutiny of Boughton. *See Sodaro v. City and County of Denver*, 753 F. Supp. 3d 1224, 1238–39 (D. Colo. 2024); *Bustillos v. City of Artesia*, 98 F.4th 1022, 1036–38 (10th Cir. 2024); *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1234 (10th Cir. 2020).

108B. Separately and in the further alternative, Plaintiff incorporates the same comparator allegations to support an Equal Protection class-of-one theory under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing class-of-one liability

where a plaintiff alleges intentional differential treatment of similarly situated others and no rational basis for the difference), and *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005) (applying the *Olech* class-of-one framework to selective regulatory enforcement); *see also Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (citing *Mimics* for the same proposition while affirming dismissal of the claim there for insufficient comparator pleading). Plaintiff and Boughton were similarly situated in all material respects relevant to the May 19, 2024 enforcement decision: both were alleged participants in the same encounter; both were alleged to have engaged in weapon-related conduct during that encounter; both were connected to video evidence bearing on the competing allegations; and Defendants had the practical ability to investigate both sides before deciding whom to arrest. Defendants' decision to arrest Plaintiff while declining any comparable enforcement action against Boughton lacked any rational basis. Although *Olech*'s per curiam framework requires only intentional differential treatment without rational basis, *see* 528 U.S. at 564–65 (declining to reach the alternative "subjective ill will" theory), Plaintiff additionally pleads animus and ill will sufficient to satisfy both the alternative framework recognized in Justice Breyer's concurrence in result, *id.* at 565–66 (Breyer, J., concurring in result), and the Tenth Circuit's "spiteful effort" formulation in *Mimics*, 394 F.3d at 849: Defendant Joshua T. Miller's pre-encounter prejudgment of Plaintiff to the complainants (¶ 41C), the affidavit's incorporation of Plaintiff's own protected-speech vocabulary into the probable-cause narrative (¶ 51E), and the deliberate audio mute during the deliberation window in which the differential enforcement decision was reached (¶ 25D). *Olech*'s class-of-one framework is unaffected by the Supreme Court's later decision in *Engquist v. Oregon Department of*

*Agriculture*, 553 U.S. 591 (2008), which held only that class-of-one claims are not cognizable in the public-employment context. *Id.* at 605. The Tenth Circuit has not extended *Engquist* beyond that context. *See Kansas Penn Gaming*, 656 F.3d at 1217 n.1 (declining to "consider the outer reaches" of *Engquist* and noting an inter-circuit split on whether *Engquist* applies to police investigative or enforcement decisions). In any event, the facts pleaded at ¶¶ 41C, 51E, and 25D take this case outside the "subjective, individualized" discretionary-decisionmaking concern that animated *Engquist*'s reasoning. *See* 553 U.S. at 603–04.

108C. The *Nieves* alternative (¶¶ 108, 108A) and the *Olech* alternative (¶ 108B) are pleaded as independent theories. The *Nieves* alternative is pleaded only with respect to the First Amendment retaliation claim (Sixth Claim) and operates to defeat any probable-cause defense to that claim. The *Olech* alternative is pleaded with respect to the Eighth Claim (Equal Protection — Selective Enforcement) and does not depend on the existence or absence of probable cause; it depends on the irrational and animus-based differential treatment of similarly situated comparators. Plaintiff does not waive either theory by pleading the other.

108D. The Heck-safe disclaimer at ¶ 53A is incorporated by reference.

109. Defendants' retaliation violated Plaintiff's rights under the First Amendment.

110. As a direct and proximate result, Plaintiff suffered arrest, detention, bond restrictions, a mandatory protection order, firearm/ammunition-related restrictions, court appearances, defense costs, emotional distress, reputational harm, and other damages.

110A. Plaintiff is entitled to seek punitive damages on this First Amendment retaliation claim because each Defendant acted with malicious intent, evil motive, or, at minimum,

reckless or callous indifference to Plaintiff's federally protected rights. Smith v. Wade, 461 U.S. 30, 56 (1983). The factual basis distinguishing this case from a Lavicky-style "arrogant ignorance" theory, see Lavicky v. Burnett, 758 F.2d 468, 477 (10th Cir. 1985), comprises six core indicia:

(i) Joshua T. Miller's individualized prior knowledge of Plaintiff via 23C1210 service in 2023 and Plaintiff's October 2023–May 2024 stalking-report communications, ¶¶ 51C–51D;

(ii) Joshua T. Miller's named, individually addressed receipt of the February 20 and May 3, 2024 written notices announcing intended federal civil-rights litigation, ¶¶ 51A–51B;

(iii) the deliberate BWC audio mute spanning the post-complainant-interview, pre-Plaintiff-contact deliberation window, ¶ 25D;

(iv) the probable-cause affidavit's incorporation of Plaintiff's protected-speech vocabulary in the "Neo Nazi conspiracy" framing that tracked Plaintiff's prior written complaints rather than any element of the alleged offense, ¶ 51E;

(v) the on-scene refusal of Plaintiff's request to view the complainants' video, the on-scene failure to provide Plaintiff any opportunity to display the contemporaneous video evidence in Plaintiff's possession, and the on-scene disregard of French's twofold express disclaimer that she did not know whether Plaintiff was pointing the firearm at her, ¶¶ 28–33; and

(vi) Defendants conducted the encounter while Plaintiff was visibly struggling under documented disability symptoms in close-quarters proximity that they knew or should have known would impair his ability to articulate exculpatory facts and would

compound disability-related stress responses Joshua T. Miller had constructive notice of. See ¶¶ 24C, 29, 51D, 51I.

## SEVENTH CLAIM FOR RELIEF

### Fourteenth Amendment Due Process - Fabrication of Evidence /

### Materially False or Misleading Criminal-Process Narrative 42 U.S.C. § 1983

### Against Defendants Joshua T. Miller, Sergeant Uriah Cain Speight, and Deputy Jeremy Miller

111. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

112. Plaintiff pleads this claim in addition to, and in the alternative to, the Fourth Amendment malicious-prosecution / judicial-deception claim. This claim is not based on negligence, mistake, or a free-standing reckless-investigation theory. It is based on knowing or reckless fabrication, material omissions, and maintenance of a false or misleading criminal-process narrative that caused Plaintiff to be deprived of liberty.

112A. The liberty deprivations caused by Defendants' fabrication and material omissions extend beyond the Fourth Amendment seizure pleaded in the Second Claim. They include: (a) Plaintiff's compelled compliance with the mandatory protection order in 24CR184 from May 20, 2024 through October 9, 2025; (b) Plaintiff's compelled compliance with no-weapons conditions and firearm/ammunition relinquishment requirements during that same period, with attendant deprivation of Plaintiff's property and Second Amendment-related liberty interests; (c) Plaintiff's compelled court appearances, defense-preparation obligations, and out-of-pocket defense costs; (d) Plaintiff's reputational harm flowing from the public charging document and probable-cause record; and (e) the exacerbation of Plaintiff's documented

disability-related distress, trauma, and functional impairment caused by the ongoing criminal-process restraints. Each of these liberty deprivations is distinct from the warrantless seizure pleaded in the First Claim and from the seizure-pursuant-to-legal-process pleaded in the Second Claim. *Cf. Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007). Each of the liberty deprivations identified in (a)–(e) extends in time, scope, or substance beyond the Fourth Amendment seizure analyzed in the Second Claim and is independently cognizable under the Due Process Clause irrespective of how this Court resolves the Fourth Amendment analysis. See Pierce v. Gilchrist, 359 F.3d 1279, 1285–86 (10th Cir. 2004) (recognizing Fourteenth Amendment fabrication-of-evidence claim as constitutional injury distinct from Fourth Amendment seizure analysis); Truman v. Orem City, 1 F.4th 1227, 1235–36 (10th Cir. 2021); see also Halsey v. Pfeiffer, 750 F.3d 273, 290–94 (3d Cir. 2014) (recognizing fabrication-of-evidence claim under the Due Process Clause); Black v. Montgomery County, 835 F.3d 358, 369–71 (3d Cir. 2016) (Fourteenth Amendment fabrication claim viable where prosecution ends without conviction).

112B. Plaintiff alleges that Defendants knowingly fabricated the materially false "no proof" narrative described above, that the fabricated narrative was used to obtain the May 20, 2024 probable-cause determination and to support the continued legal-process restraints in 24CR184, and that the use of the fabricated narrative deprived Plaintiff of liberty during the entirety of the prosecution. The criminal proceedings terminated without a conviction on October 9, 2025. See *Truman v. Orem City*, 1 F.4th 1227, 1235–36 (10th Cir. 2021); *Pierce v. Gilchrist*, 359 F.3d 1279, 1293, 1298 (10th Cir. 2004); Coones v. Bd. of Cnty. Comm'rs of Wyandotte Cnty./Kansas City, Kansas, 166 F.4th 1, 23 (10th Cir. 2026) (noting that police-officer Brady mens rea can be "satisfied

by either knowledge or reckless disregard for the truth"); Heck v. Humphrey, 512 U.S. 477, 486–87 (1994). Manuel v. City of Joliet, 580 U.S. 357 (2017), addressed only the constitutional source of malicious-prosecution doctrine for pretrial detention; it did not abrogate Pierce, and the Tenth Circuit has continued to apply Pierce's mens-rea standard in published authority decided thereafter. See Truman v. Orem City, 1 F.4th 1227 (10th Cir. 2021); Coones, 166 F.4th 1, 23–24.

112C. The right not to be deprived of liberty as a result of knowingly or recklessly fabricated evidence was clearly established by binding Supreme Court and Tenth Circuit precedent well before May 19, 2024. See *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004); *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021); *Coones v. Bd. of Cnty. Comm'rs of Wyandotte Cnty./Kansas City, Kansas*, 166 F.4th 1, 23 (10th Cir. 2026) (noting that police-officer Brady mens rea can be "satisfied by either knowledge or reckless disregard for the truth"); *Hope v. Pelzer*, 536 U.S. 730 (2002); *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam).

112D. The existence of probable cause does not necessarily defeat a Fourteenth Amendment fabrication-of-evidence claim. Such a claim "requires a plaintiff to plausibly plead the presence of proximate cause, not the absence of probable cause"; the dispositive inquiry is whether, "but for that evidence, defendants would not have arrested and charged" the plaintiff. Morphew v. Chaffee County, 172 F.4th 802, 821–22 (10th Cir. 2026). Morphew further explains that "[i]t is generally understood that the existence of probable cause does not necessarily defeat a Fourteenth Amendment fabrication of evidence claim," collecting authority from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits in support and recognizing the Eighth Circuit's contrary view. Id. at 822 & n.19. Plaintiff's Seventh Claim is therefore independently

viable as to the fabricated "no proof" narrative regardless of how this Court resolves the Fourth Amendment probable-cause analysis applicable to the First and Second Claims.

113. Plaintiff had a clearly established Fourteenth Amendment right not to be deprived of liberty as a result of knowingly fabricated evidence, materially false reports, or materially misleading omissions by government officers.

114. Joshua T. Miller knowingly or recklessly created, submitted, maintained, or caused the use of a materially false and misleading probable-cause narrative by omitting Plaintiff's contemporaneous offer to show exculpatory video, omitting the refusal to review that video, omitting the limited nature of what the complainants' video actually showed, and omitting or mischaracterizing Plaintiff's cross-complaint that the reporting parties had pointed guns at him. The Tenth Circuit has repeatedly extended Brady's evidence-suppression and false-evidence-creation obligations to police officers and other law-enforcement personnel actively involved in an investigation, with a mens rea satisfied by either knowledge or reckless disregard for the truth. Coones v. Bd. of Cnty. Comm'rs of Wyandotte Cnty./Kansas City, Kansas, 166 F.4th 1, 23 (10th Cir. 2026) (recognizing that the Tenth Circuit has "repeatedly 'extended Brady obligations' to both police officers and 'other personnel in the police department who are actively involved in a particular investigation,'" and that "for more than two decades…the mens rea requirement for this type of claim can be satisfied by either knowledge or 'reckless disregard for the truth'" (collecting Tiscareno, Bledsoe, Pierce, and Johnson)); Johnson v. City of Cheyenne, 99 F.4th 1206, 1225 (10th Cir. 2024) (police-officer Brady liability requires "a mental state surpassing negligence—that is, acting at least knowingly or recklessly").

115. The mens rea allegations applicable to each Defendant named in this Claim are pleaded at ¶¶ 114 and 116.

116. Speight knowingly or recklessly contributed to the fabricated or misleading narrative by authoring, reviewing, approving, ratifying, or failing to correct a supplemental report stating that Plaintiff had no proof, despite being present and despite Joshua Miller's body-worn camera capturing Plaintiff's attempted offer to show video proof and despite Speight's own awareness that no body-worn-camera footage from Speight's perspective had been preserved, notwithstanding Joshua T. Miller's contemporaneous on-camera misrepresentation to Plaintiff that both officers' body-worn cameras were recording, see ¶ 25D.

117. The fabricated or misleading narrative was material because it was used to justify Plaintiff's arrest, probable-cause determination, bond conditions, mandatory protection order, no-weapons conditions, firearm/ammunition relinquishment requirements, court appearances, and continued prosecution in 24CR184.

118. Without the fabricated or misleading narrative, and with the omitted exculpatory facts included, Defendants would not have arrested and charged Plaintiff, and Plaintiff would not have been subjected to legal process or forced to defend 24CR184. *See* Morphew v. Chaffee County, 172 F.4th 802, 821–22 (10th Cir. 2026) (causal connection between fabricated evidence and deprivation of liberty is required element of due-process fabrication-of-evidence claim).

118A. The Truman / Morphew elements — knowing fabrication, use against Plaintiff, deprivation of liberty, and favorable termination — are satisfied by the allegations at ¶¶ 41A, 49A, 70, 89, 112B, 114, 116, 117, and 118; the Heck-safe disclaimer at ¶ 53A applies.

118B. Unlike the plaintiff in Morphew, who failed to allege the fabricated evidence "even influenced the defendants' decision to prosecute him," 172 F.4th at 822, Plaintiff here affirmatively pleads that the fabricated "no proof" narrative was the necessary support for the May 20, 2024 probable-cause finding (¶ 67) and that, with the false statements

removed and omitted exculpatory facts added, probable cause would not have existed (¶¶ 70, 89). The corrected-affidavit framework set out at ¶¶ 41A, 41B, 42C states the precise causal allegation Morphew identified as missing in that case.

119. The conduct of Defendants was intentional, knowing, reckless, and not merely negligent or mistaken.

120. Case 24CR184 terminated without a conviction when it was dismissed on October 9, 2025.

121. The Heck-safe disclaimer at ¶ 53A is incorporated by reference; none of the fabricated material at issue in this Claim concerns the 24CR271 charges.

122. Defendants' conduct violated Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment.

123. As a direct and proximate result, Plaintiff suffered loss of liberty, criminal-process restraints, court-imposed restrictions, economic loss, defense costs, emotional distress, reputational harm, and other damages.

## EIGHTH CLAIM FOR RELIEF

### Fourteenth Amendment Equal Protection - Selective Enforcement

### 42 U.S.C. § 1983

### Against Defendants Joshua T. Miller and Sergeant Uriah Cain Speight

124. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

125. Plaintiff pleads this claim in the alternative to the extent Defendants Joshua T. Miller and Speight contend they exercised ordinary enforcement discretion during the May 19, 2024 encounter at Plaintiff's residence.

126. Plaintiff was treated differently from a similarly situated same-incident participant during the May 19, 2024 investigation and arrest decision.

127. Plaintiff and Shaun Boughton were similarly situated in all material respects for purposes of the May 19, 2024 enforcement decision because both were alleged participants in the same encounter, both were alleged to have engaged in weapon-related conduct during that encounter, both were connected to video evidence bearing on the competing allegations, and officers had the ability to investigate both sides before deciding whom to arrest. *See Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166–68 (10th Cir. 2003); *see also Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Plaintiff incorporates ¶¶ 108B–108C herein in support of this class-of-one theory.

127A. The heightened similarity standard applicable to class-of-one claims in discretionary-enforcement contexts, see Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011); cf. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 603–04 (2008), is satisfied here as to Boughton on the comparator facts pleaded at ¶¶ 39B, 127–130: same encounter, same officers, same facts, more aggressive alleged conduct by the comparator. French's role as second-pass recorder and 911 caller is pleaded in support of the false or misleading narrative addressed in Plaintiff's Second and Seventh Claims, not as an Equal Protection comparator.

127B. Plaintiff's selective-enforcement claim arises under both the traditional Marshall framework — with the differential enforcement based on Plaintiff's exercise of First Amendment-protected reporting, recording, evidence-preservation, and petitioning activity, see ¶¶ 51A–51K — and, in the alternative, under the Olech class-of-one framework, ¶ 108B. The Marshall framework applies "ordinary equal protection

Page 73 of 80

standards" as articulated by the Supreme Court in Wayte v. United States, 470 U.S. 598, 608 (1985), and United States v. Armstrong, 517 U.S. 456, 465 (1996). *See* Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166–68 (10th Cir. 2003) (applying Wayte/Armstrong "ordinary equal protection standards" to selective-enforcement claims in police-arrest context). Wayte expressly identifies as protected against selective enforcement "the exercise of protected statutory and constitutional rights," 470 U.S. at 608, making the Marshall framework independently available where the differential treatment was motivated by Plaintiff's First Amendment activity.

128. Plaintiff reported to Defendants on-scene that Boughton and the reporting parties had driven past Plaintiff's residence on multiple occasions, harassed Plaintiff, and pointed firearms at Plaintiff, including Boughton's pistol-pointing during the OHV pass-by.

129. Plaintiff possessed contemporaneous video on his recording device at the scene and attempted to identify and offer it to Defendants; Plaintiff additionally requested to view the complainants' video and was refused by Joshua T. Miller; Defendants did not provide Plaintiff any opportunity to display the contemporaneous video evidence in Plaintiff's possession. Instead, Defendants credited the complainants' incomplete and misleading narrative, relied on a complainant video that did not clearly show Plaintiff, did not show Plaintiff with a firearm, and did not show Boughton's left hand or what he was holding, and arrested Plaintiff.

130. Defendants did not arrest Boughton, did not initiate or refer comparable weapon-related charges against Boughton, did not create comparable officer reports or probable-cause materials against Boughton, and did not otherwise subject Boughton to comparable officer-initiated criminal process arising from the same incident.

131. Plaintiff incorporates ¶¶ 108B and 108C in support of the rational-basis and animus elements of this claim. To the extent any defendant is granted qualified immunity on this Eighth Claim on the ground that single-incident class-of-one selective-enforcement law was not clearly established as of May 19, 2024, the comparator facts pleaded at ¶¶ 108A, 127–130 independently support Plaintiff's Sixth Claim under the *Nieves* exception. *See Nieves v. Bartlett*, 587 U.S. 391, 406–07 (2019); *Gonzalez v. Trevino*, 602 U.S. 653, 657–58 (2024) (per curiam) (clarifying that the only express limit on the evidence a plaintiff may present to satisfy the *Nieves* exception is that it must be objective).

131A. Independently, the existence or absence of probable cause is not dispositive of Plaintiff's selective-enforcement claim. The Tenth Circuit has expressly held that lack of probable cause is not an element of a selective-enforcement equal-protection claim, and that arguable probable cause for an arrest does not establish qualified immunity on such a claim. *See Detreville v. Gurevich*, No. 24-1427, 2025 WL 1874587, at *9 (10th Cir. July 8, 2025) (unpublished); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003); *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015). To the extent Defendants assert that arguable probable cause for the May 19, 2024 arrest defeats Plaintiff's Eighth Claim, that argument is foreclosed as a matter of Tenth Circuit law.

132. Defendants' selective enforcement violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.

133. As a direct and proximate result, Plaintiff suffered damages.

## NINTH CLAIM FOR RELIEF

### C.R.S. § 13-21-131 - Colorado Constitution Article II, Sections 10 and 25

**(and, alternatively, Section 24)**

**Retaliation, Fabrication of Evidence, Due Process, and Selective Enforcement**

**Against Defendants Joshua T. Miller, Sergeant Uriah Cain Speight, and Deputy Jeremy Miller**

134. Plaintiff incorporates by reference Paragraphs 1 through 57, including all lettered subparagraphs, as if fully set forth herein.

    134A. Plaintiff incorporates by reference the Heck-safe disclaimer at ¶ 53A; none of the conduct at issue in this Ninth Claim concerns the 24CR271 charges. C.R.S. § 13-21-131(2)(b) provides that 'qualified immunity is not a defense' to a claim brought under that statute; Defendants are not entitled to assert qualified immunity as a defense to this Claim. The factual allegations supporting this Ninth Claim include the materially false and incomplete probable-cause record (¶¶ 41A, 41B, 41C); the BWC mute / strategy-discussion window (¶ 25D); Plaintiff's protected reporting activity, on-scene First Amendment invocation, and recording activity (¶¶ 104, 104A, 104B); the 'no proof' supplemental narrative (¶¶ 69, 116); and the selective enforcement comparator analysis (¶¶ 108A–108C, 127–130).

135. At all relevant times, Defendants were peace officers acting under color of law within the meaning of C.R.S. § 13-21-131.

136. Plaintiff had rights secured by the Colorado Constitution, including the right not to be deprived of liberty or property without due process of law under Article II, Section 25, and the right to 'apply to those invested with the powers of government for redress of grievances' under Article II, Section 24. The Article II, Section 24 petition right is pleaded as alternative and cumulative authority for the same conduct protected under Article II, Section 10, addressed at ¶ 136A.

136A. Article II, Section 10 of the Colorado Constitution provides that '[n]o law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty.' The Colorado Supreme Court has long recognized that Article II, Section 10 provides greater protection of free speech than does the First Amendment to the Federal Constitution. See Bock v. Westminster Mall Co., 819 P.2d 55, 59–60 (Colo. 1991); Lewis v. Colo. Rockies Baseball Club, Ltd., 941 P.2d 266, 271 (Colo. 1997). Plaintiff's protected reporting, recording, evidence-preservation, complaining, and intended-litigation activities described at ¶¶ 51A–51K, 104, 104A are protected under Article II, Section 10.

137. Defendants subjected Plaintiff, or caused Plaintiff to be subjected, to deprivation of the rights identified at ¶ 136, through the retaliation, fabrication, video-refusal, and selective-enforcement conduct pleaded at ¶¶ 28–29, 41, 41A, 41B, 41C, 67, 69, 105, 116, and 127–130, and the resulting legal-process restraints pleaded at ¶¶ 46, 47, 110, and 112A.

137A. Under Mosley v. Daves, 2025 COA 80, ¶ 35, 580 P.3d 584 (holding that justification for warrantless law-enforcement conduct is an affirmative defense in a § 13-21-131 action, with the officer bearing the burden of proof by a preponderance of the evidence), Defendants will bear the burden of proving any claimed justification for their warrantless arrest of Plaintiff and the materially false probable-cause record they subsequently submitted.

138. Speight and Deputy Jeremy Miller are also independently liable under C.R.S. § 13-21-131 for failing to intervene despite knowing or having reason to know that other peace officers were depriving Plaintiff of rights secured by Article II, Sections 10, 24, and 25. The duty to

intervene against fabrication and judicial deception by fellow officers is incorporated by reference from ¶¶ 78A, 78B, 80, 96, 97.

139. Defendants acted intentionally, knowingly, recklessly, and/or with deliberate indifference to Plaintiff's Colorado constitutional rights. Plaintiff incorporates the subjective-awareness factual basis pleaded at ¶ 110A as supporting Defendants' intentional, knowing, reckless, and deliberately indifferent conduct under this Claim.

140. As a direct and proximate result, Plaintiff suffered damages and is entitled to legal, equitable, declaratory, and other appropriate relief, including costs and any recoverable fees, including attorney fees incurred if Plaintiff is represented by counsel at any stage, as provided by C.R.S. § 13-21-131. *See Mosley v. Daves*, 2025 COA 80, 580 P.3d 584 (applying the § 13-21-131(3) attorney-fee framework).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants, and requests:

A. Compensatory, economic, consequential, nominal, and other damages in an amount to be determined at trial;

B. Punitive damages against Defendants in their individual capacities on the federal § 1983 claims to the extent permitted by federal law. *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

(i) Plaintiff specifically pleads punitive damages on the Sixth Claim (First Amendment Retaliation) as to all three Defendants, supported by direct evidence of each Defendant's subjective awareness of Plaintiff's protected activity (¶ 110A) and the close temporal proximity between Plaintiff's protected reporting and the May 19, 2024 arrest.

(ii) Plaintiff additionally pleads punitive damages on the Second Claim (Fourth Amendment Malicious Prosecution / Judicial Deception) and the Seventh Claim (Fourteenth Amendment Fabrication / Materially False Criminal-Process Narrative) as to Defendant Joshua T. Miller specifically, supported by Joshua T. Miller's prior individualized contacts with Plaintiff (the 2023 Civil Protection Order service in 23C1210, completed without incident, as alleged in ¶ 51C; and Joshua T. Miller's receipt and disregard of Plaintiff's subsequent stalking-report emails, as alleged in ¶¶ 51D and 104); the deliberate audio gap on Joshua T. Miller's body-worn-camera footage during the deliberation window (¶ 25D); the inflammatory and prejudicial characterizations of Plaintiff included in Joshua T. Miller's probable-cause statement (¶¶ 41, 41A); and Joshua T. Miller's knowing or reckless creation and submission of a materially false and incomplete probable-cause statement on May 20, 2024.

(iii) Plaintiff reserves the right to seek leave to amend to plead punitive damages on additional claims and as to additional Defendants if discovery supports them.

C. Legal, equitable, declaratory, and other appropriate relief under C.R.S. § 13-21-131;

D. Taxable costs and recoverable litigation costs as allowed by law, including costs under C.R.S. § 13-21-131(3) and 28 U.S.C. § 1920; and, to the extent Plaintiff is represented by counsel at any stage of this action, reasonable attorney fees under C.R.S. § 13-21-131(3) and 42 U.S.C. § 1988.

E. Plaintiff further requests declaratory relief that Defendants' conduct violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and Article II, Sections 7, 10, 24, and 25 of the Colorado Constitution.

F. Prejudgment and post-judgment interest as allowed by law;

G. All other relief the Court deems just and proper.

Plaintiff does not plead Colorado-law exemplary damages in this initial complaint except to the extent such relief may later be permitted by amendment or otherwise allowed by law.

Plaintiff requests that, at the appropriate stage of this case, the Court apply the permissive inference authorized by C.R.S. § 24-31-902(1)(a)(III) regarding Speight's missing body-worn-camera footage and, in the alternative, an adverse inference under federal common-law spoliation principles.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 12th day of May, 2026,

Maxfield Alton Sussman, Plaintiff Pro Se

114 Sunset Trail, Cotopaxi Colorado 81223

706-897-5899

maxs1983184@gmail.com

Dated: 12th day of May, 2026